## COMMERCIAL TRAVELERS' MUT. ACC. ASS'N OF AMERICA v. FULTON et al.

(Circuit Court of Appeals, Second Circuit.  February 23, 1897.)

1. APPEAL—EXCEPTIONS.

Exceptions to instructions taken after the jury had retired will not be considered on appeal. Park Bros. & Co. v. Bushnell, 9 C. C. A. 140, 60 Fed. 583, followed.

2. INSURANCE POLICY—CONSTRUCTION.

All ambiguities and obscurities in a policy of insurance are to be resolved against the insurer, and therefore the word "effected" in an accident policy will not, in order to relieve the insurer, be read "affected," although it be meaningless as written.

3. ACCIDENT INSURANCE—DISEASE CONTRIBUTING TO DEATH.

Under a policy of accident insurance which provides that it shall not extend to nor cover accidental injuries or death "resulting from or caused, directly or indirectly, wholly or in part, by disease in any form," there can be no recovery for the death of the insured if he had a disease but for which death would not have resulted from the accident; and, where the insured had a diseased heart, it was error to give an instruction allowing the jury to find for the plaintiffs if they believed the accident was sufficient to cause the death of a man with a diseased heart, although insufficient to kill one with a normally healthy heart.

This case comes here upon writ of error to the circuit court, Northern district of New York. The action was brought by the plaintiffs (who are defendants in error) to recover $5,000 under a certificate of membership issued by defendant (which is plaintiff in error) to Thomas K. Fulton, and which, in effect, insured the plaintiffs, his beneficiaries, in the event of his death by accident. The jury found a verdict in favor of plaintiffs, upon which judgment was entered. The facts sufficiently appear in the opinion.

M. W. Van Auken, for plaintiff in error.
Chas. A. Talcott, for defendants in error.

Before LACOMBE and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. The relevant parts of the policy, which is dated November 17, 1892, are as follows:

"The Commercial Travelers' Mutual Accident Association of America, by this certificate of membership, in consideration of the membership fee and the warranties and agreements contained in his application for membership, hereby accepts Thomas K. Fulton, * * * and hereby insures him, in the fol-

lowing manner, subject * * * to all conditions hereinafter contained, against personal, bodily injuries affected during the continuance of membership and this insurance, through external, violent, and accidental means, to wit: (1) In the sum of $25 per week against loss of time * * * resulting from bodily injuries, effected through means as aforesaid, which shall, independently of all other causes, immediately, wholly, and continuously disable him. * * * (2) Or if such injuries alone shall immediately sever, above the wrist or ankle, one hand and foot," etc., "* * * the association will pay to the insured * * * $5,000. (3) Or if such injuries alone shall in like manner immediately sever either hand or foot," etc., "* * * the association will pay to the insured * * * $2,500. (4) Any member of this association who, during the continuance of his membership, sustains, through external, violent, and accidental means, an injury, which injury alone, in the judgment of the medical examiners, causes total disability, * * * the said member shall * * * receive $2,500. (5) Or if such injuries alone shall immediately and entirely destroy one eye," etc., "* * * the association will pay * * * $1,000. (6) Or if death shall result from such injuries alone, and within three calendar months, the association will pay $5,000 to his sisters, Harriet and Anna Fulton. * * * The conditions under which this certificate is issued and accepted by the insured (member) are as follows: First. The insurance shall not extend to or cover disappearances, or injuries, whether fatal or disabling, of which there is no external, visible mark on the body of the insured; nor extend to or cover accidental injuries or death resulting from or caused directly or indirectly, wholly or in part, by hernia, fits, vertigo, somnambulism or disease in any form, or while effected thereby; nor extend to cover injuries or death resulting from or caused by gas or poison," etc.

On January 1, 1895, the insured, a man weighing from 180 to 190 pounds, while on the sidewalk, waiting for a street car, suddenly fell. From the evidence the jury were entitled to infer that his fall was caused by an accidental slip upon snow or ice, and for the purposes of this appeal it must be assumed that the fall was the result of an accident. In falling he struck upon an iron water spout which projected a few inches above the sidewalk, and which left external, visible marks upon his head and face, in the form of abrasions or bruises not supposed at the time to be of a serious character. He died from 15 to 20 minutes after the accident, and was buried without any careful examination into the cause of death. Three months after interment the body was exhumed and an autopsy made. It then appeared that at the time of the accident the deceased was affected with a diseased condition of the aortic valves and calcification of both coronary arteries. Calcification is a deposit of lime salts in the walls of the tube, making it rigid and fragile, instead of elastic, as it is in health. There was dilation of the heart and hypertrophy. It is unnecessary to go into further details, since the plaintiffs' own expert, who was present at the autopsy, testified that "the conditions which [he] found in the heart would indicate that the heart was diseased." There was much dispute upon the testimony as to what the autopsy disclosed as to the condition of the brain, but on this appeal it must be assumed that there was evidence of injury to the brain, resulting from the blows which left the marks found after his fall.

Before proceeding to discuss the points which are raised by exceptions of the plaintiff in error seasonably taken, it seems appropriate to call attention to a point of practice. Eleven of the exceptions to the charge of the judge, which have been assigned as error, and to which argument has been addressed in the brief, were

not taken, as the record shows, until after the jury had retired in charge of a sworn bailiff. This practice has been expressly condemned by the supreme court in Hickory v. U. S., 151 U. S. 316, 14 Sup. Ct. 334, and by this court (Park Bros. & Co. v. Bushnell, 9 C. C. A. 140, 60 Fed. 583), for reasons which may be found therein set forth. If, as plaintiff in error suggested on the oral argument, this was by the express direction of the trial judge, who thus deprived plaintiff in error of the opportunity to take its exceptions at the proper time, that fact should have been set forth in the record, and we might afford proper relief. But, in the absence of anything to indicate such a departure from the well-settled practice, we must assume that this case is in that respect on all fours with Park Bros. v. Bushnell, supra, and dispose of these 11 exceptions in the manner indicated in that case. Fortunately for plaintiff in error, the exceptions which were properly reserved sufficiently present the points it has argued in this court.

Inasmuch as it is conceded that Fulton was affected with a serious disease of the heart at the time of the accident, defendant contends that his beneficiaries were not entitled to recover, and that verdict should have been directed for defendant. It is insisted that the conditions of the policy were expressly designed to meet just such a case, and to avoid all controversy between medical experts as to the relative potency of external and internal conditions causing death; that it was designed to take the place of medical examinations into the physical condition of members, each member stipulating that if he was affected by a rotten heart, or Bright's disease, or an incipient cataract, or other disease which might be calculated to increase his risk of injury, or his risk of damage from injury, he would not call upon the association for relief. The language of the condition referred to is:

"The insurance under this contract shall not * * * extend to or cover accidental injuries or death resulting from or caused directly or indirectly, wholly or in part, by hernia, fits, vertigo, somnambulism or disease in any form, or while effected thereby."

The sentence is ungrammatical, and the last clause meaningless, as may be seen from the following analysis:

Insurance under this contract shall not cover

| | |
|---|---|
| A. Accidental injuries or death | resulting from or caused, directly or indirectly, wholly or in part, by<br>1. Hernia.<br>2. Fits.<br>3. Vertigo.<br>4. Somnambulism.<br>5. Disease in any form. |
| B. Accidental injuries or death | while effected by<br>1. Hernia.<br>2. Fits.<br>3. Vertigo.<br>4. Somnambulism.<br>5. Disease in any form. |

If the word "while" were given the meaning it sometimes has, viz. "when," the word "effected" would qualify the antecedent "accidental injuries or death," and the whole sentence would be gram-

matically accurate; but, if so construed, clause B would mean no more than clause A. To give to the clause the meaning for which defendant contends, it would be necessary to change the word "effected" to another word, with a different meaning, viz. "affected." It may very well be that it was the intention of the defendant to print the latter word in its forms of policy, but that does not change the situation. This is an action at law upon the contract as it was made and executed, not a suit in equity to reform the contract, fortified with evidence appropriate to such a prayer for relief, and we must take the contract as we find it. Upon familiar principles, all its ambiguities and obscurities are to be resolved against the draftsman.

Although no meaning more favorable to the defendant can be spelled out of the last clause, the residue of the sentence contains a perfectly plain, unambiguous, and explicit statement, in harmony with all the other provisions of the policy. The insurer is not to respond when death is caused directly or indirectly by disease, nor when it is caused in part by disease. In other words, when the accident (such as a fall) which causes the death was itself caused by some disease, or when an existing disease co-operates with the accidental injuries to cause the death, or when the accidental injuries are of such a character that they would not cause the death of a person in normal health, but do kill the insured, because an existing disease, unknown to the insurer, unknown perhaps to the insured, has put him into such an abnormal condition that he is unable to resist the effects of the injuries as he would if in normal health,—in none of these cases is the insurer liable. The true construction of a clause providing that a policy shall not cover "death or disability resulting wholly or in part, directly or indirectly * * * from disease or bodily infirmity," is found admirably expressed in the opinion of the circuit court of appeals for the Eighth circuit in Association v. Shryock, 20 C. C. A. 5, 73 Fed. 775:

"If he sustained an accident, but at the time it occurred he was suffering from a pre-existing disease or bodily infirmity, and if the accident would not have caused the death if he had not been affected with the disease or infirmity, but he died because the accident aggravated the effects of the disease, or the disease aggravated the effects of the accident, the express contract was that the association should not be liable for the amount of the insurance. The death in such a case would not be the result of the accident alone, but it would be caused partly by the disease and partly by the accident."

Much has been said in argument upon the question of proximate and remote cause. It may be well to refer to some of the cases cited on the briefs, in order the better to appreciate, when the evidence in this record is discussed, that such question plays no part here: In Insurance Co. v. Melick (also in the court of appeals for the Eighth circuit) 12 C. C. A. 544, 65 Fed. 178, the condition excluded "death * * * resulting wholly or partly * * * from . disease or bodily infirmity, * * * intentional injuries (inflicted by the insured or any other person)." The insured accidentally shot himself in the foot. The wound resulted in tetanus or lockjaw, and on the eighteenth day after the accident he was found dead, with his thoat cut and a scalpel in his hand; having also been in the em-

brace of tetanic spasm, causing intense agony, at the time of his death; the evidence leaving it an open question whether the spasm or the cut was the immediate cause of death. It was left to the jury to determine whether the accident was the approximate cause of the death. It will be noted that no independent disease had contributed in any way to the catastrophe. The spasm or the delirious impulse to end his tortures were both themselves caused solely by the accident. In Freeman v. Association, 156 Mass. 351, 30 N. E. 1013, the policy covered where "accidental injuries alone * * * shall have occasioned death," and did "not extend to any case * * * in which death or disability occurs in consequence of disease, * * * nor to any case except where the injury is the proximate cause of the disability or death." It was proved that the insured, Freeman, died of peritonitis localized in the region of the liver, and the evidence tended to show that it was induced by a fall. There was also evidence indicating that he had previously had peritonitis in the same part, and that the previous disease had produced effects which rendered him liable to a recurrence of it; but there was no evidence to show that he had peritonitis or any other disease at the time of the fall. The court gives a careful and elaborate definition and discussion of "proximate cause" within the meaning of the policy. That definition and discussion, however, were in criticism and disapproval of a contention of the defendant that the jury should have been charged that defendant was not liable in case of death from disease, even if the disease is caused by an accident,—a very different hypothesis from the one at bar, where there is no suggestion that the disease which defendant insists cooperated to produce death was itself caused by the accident. When the Massachusetts court, however, deals with the other branch of the case, it approves of the charge under review, which instructed the jury as follows:

"The question as to whether peritonitis, if that caused his death, is to be deemed a disease, within the meaning of this policy, and the proximate cause of death, within the meaning of this policy, so far as to prevent a recovery, depends upon the question whether or not, before the time of the fall and at the time of the fall, he had then the disease,—was then suffering with the disease. If he was, then, in the sense of the policy, although aggravated and made fatal by the fall, he cannot recover."

And the charge in the Freeman Case then proceeds to deal with a case where the insured had had peritonitis, but had recovered, leaving him predisposed to contract such disease again, but not actually affected with the disease at the time of the accident. In the case now under review there is no dispute but what the insured was actually affected with disease prior to and at the time of the accident. The medical witnesses called for the defendant testified that in their opinion the injuries to the head were not fatal in their tendency, nor sufficient to cause death. On the other hand, plaintiffs' experts, or, rather, one of them, ascribed death to a hemorrhage of the brain caused by a blow on the head; the witness, on cross-examination, stating that in his opinion the injuries, as they were described by those who conducted the autopsy, might

be sufficient to cause death; adding that he thought it "entirely possible that a healthy man would be killed by falling down and striking in the places where this man, as I am told, was struck." There was therefore a conflict of evidence as to whether the injuries to the head—injuries caused by the accident—were or were not such as to cause Fulton's death.

Defendant contends that the jury were not fully and fairly instructed as to the consideration to be given by them to the conceded heart disease, in view of the testimony of the medical experts. For the purposes of this appeal, the evidence of defendant's experts may be disregarded, and defendant's contention considered in the light of the concessions made by plaintiffs' experts. Dr. Rigg took part in the autopsy as a representative of plaintiffs. He testified that he found "a diseased condition of the aortic valves, and calcification of the coronary arteries, * * * one slightly; * * * that there was a very small amount of dilation of the heart, * * * and hypertrophy; that the conditions which he found in the heart would indicate that the heart was diseased,"— and added:.

"I should certainly regard the diseased condition of the heart as the secondary cause of this man's death, but not the determining cause. * * * It would not take as much of a shock to cause death in a man whose heart was diseased as it would in the case of a man whose heart was in a healthy condition. * * * If Mr. Fulton's had been in a perfectly healthy condition, I think he would have been better able to have withstood this shock. · That is the reason that leads me to say that the unhealthy condition of the heart was the secondary cause. * * * I don't think that the fall produced any change in the heart, other than withdrawing of the nerve force. As a result of that the circulation would be arrested. Because of the diseased condition of the heart, it would be arrested the more easily. The heart would be more easily affected. * * * If this man's heart had been perfectly healthy, so far as I can determine, he might have withstood this fall."

And upon recross-examination he said:

"To sum this up, I say, in my judgment, the primary cause of his death was the fall, and the secondary cause was the diseased condition of his heart."

The other medical expert called by plaintiffs, Dr. Ford, had never seen the deceased. He testified to opinions based upon the facts testified to by the other witnesses. He said:

"I think that the injuries in this case might be sufficient to cause death. I am not positive it is sufficient. I would say that it is my opinion that death came from these injuries. * * * And I should be very positive indeed. In coming to this conclusion, I consider the condition of the heart as found in the autopsy. My idea is that death was due to some lesion in the brain produced by the blow. I hadn't said anything about the heart. I will if you want me to. I think the man was much more likely to have died from a shock of that sort, because of his weakened circulation. And that weakened circulation enabled this violence to accomplish greater results than if the condition of the heart had not been a weakened one. I should say this condition of the heart made it more easy to kill the man. That is quite a different statement than that the condition of the heart assisted in causing death, or contributed to it. I should say that a perfectly sound man, with a normal, healthy heart, would have possibly been killed by the blows such as there is evidence of in this autopsy. I do not say that every man would have been. * * * I take into consideration, in determining the cause of this man's death, the condition of the heart. The condition of this man's heart was not

the primary cause of his death, according to the account that has been read to me. I did not give an opinion that the sole cause of death was this blow. I have not been asked what other causes of death there might have been. I have not heard of any. I have not thought about it. There might have been a thousand other causes. I have heard of heart disease in connection with this case. I would not tell the jury that this organic disease of this man's heart had nothing to do with his death. I have not said so. It did have something to do with it. It made the method of killing easier. In that sense, I do not think it was one of the causes. I do not think that was the cause of death. I think he was killed easier because he had this weakened circulation than if he had been perfectly sound. Of course, I cannot say that, if he had not had this fall, that he would not have died at some time with heart disease. The general condition of the heart entered into the effect of death. Not as its causation, however, but as to the result of an injury [sic in record]. I don't think it is what is called a 'secondary cause.' That is the cause of the man's weakness, and his want of resistance, and, perhaps, the cause of his slipping up. He might have slipped more easily than if he was twenty years younger, or more healthy, but it was not the cause of death. My idea is that the immediate cause of death was this shock. If his condition had been perfectly healthy, that shock might not necessarily have caused death. In that sense, the condition of the heart was not a secondary cause. It was a condition which made him more easy to succumb to an injury, but it could not have caused the injury. I think the injury would have caused the death. This made him less able to resist the shock of the blow or injury, but it did not cause the injury, it did not form the initiative. The blow was the initiative, more or less, and, on account of the heart as it was, this blow had this effect. I do not think you can call it a 'cause' either second, third, or fourth. Without that condition the blow might have and it might not have caused."

It is, to say the least, a somewhat doubtful question whether, in this state of the proof, it was proper to send the case to the jury. Disjointed phrases may be pieced together so as apparently to sustain the proposition that Fulton was killed by the blow alone, without the efficient co-operation of any other cause. It is, of course, easy to conceive of an accidental injury so manifestly destructive of life that the diseased condition of the individual would contribute in no wise to the catastrophe. But an examination of the extended quotations supra, and of the rest of the testimony, seems to indicate that what the experts meant was what the last witness has expressed, namely, that they reject the disease as a "cause" because it did not form the initiative, but that none of them are willing to assert, even as an opinion, that the heart disease had nothing to do with the death, while all concede that it made an injury, from which an individual in normal health might stand a fair chance of recovery, necessarily fatal. However, it is not now necessary to decide this question.

At the close of the charge defendant asked the court to instruct the jury:

"That if the condition of the deceased's heart contributed to his death, as plaintiff's witness Dr. Rigg testified, plaintiff cannot recover."

To this the court replied:

"I think I will charge that, however, with the qualification, as I have already said to the jury, that if the jury find that this blow was sufficient to cause the death of a man of his weight, age, and condition at that time, that their verdict may be for the plaintiff's, even though his condition at the time of the death might have made it more difficult for him to rally from the effects of this blow than a perfectly healthy man."

Exception was duly reserved. As qualified, this instruction, standing alone, allows the jury to find for the plaintiffs if they believe the blow was sufficient to cause the death of a man with a diseased heart (which was deceased's condition), although insufficient to kill one with a normally healthy heart, which is manifestly an erroneous instruction. The court had just charged, at defendant's request, that there could be no recovery "if the fall was caused by disease" or "if disease was a secondary cause of death," or "if disease was one of the causes of death," or "if disease contributed to his death." The next request might well have been refused on the ground that the subject of contributory cause had been sufficiently covered, and defendant contends with some force that the jury might fairly understand that the qualification added to it was applicable to the last four requests. Moreover, coming as the very last statement of the court to the jury, it was calculated to leave a stronger impress upon their minds than if it had formed a single sentence in the colloquial charge. An appellate court, however, should not be astute to reverse because, in the hurry of a trial, some single phrase of voluminous instructions to the jury may contain a misstatement as to the law of the case, especially when it is uttered in ruling upon a dozen requests, which appear to have been presented to the judge only after the colloquim, instead of before he began to instruct, as they should have been. In such a case it must be collated with the rest of the charge, in order to see if, taken as a whole, the instructions may have been calculated to mislead. The very qualification complained of is itself qualified with the phrase, "as I have already said to the jury," which expressly referred them to the more detailed discussion of the subject which they had already listened to. If, therefore, when the charge is examined as a whole, it appears that the jury, if attentive, must have understood that there could be no verdict for the plaintiffs if the diseased condition of the heart directly or indirectly contributed to cause the death of Fulton; no recovery if, by reason of Fulton's diseased condition, the blow was fatal to him, although a normally healthy man would in all probability have rallied from its effects,— then the verdict should not be set aside, although the phrasing of this particular qualification be erroneous. The charge, as a whole, however, did not, in our opinion, explicitly direct the attention of the jury to the controlling issue in the case. The defendant requested the court to charge that the burden of proof was upon the plaintiffs to show "that the injuries resulting from the fall alone caused death." To this the court replied: "I do charge that. It must be the proximate cause of death." This is the keynote of the whole charge, and, taken as a whole, it evidently directed the attention of the jury to deciding the question what was the "proximate cause" of death. The natural result would be that, having reached the conclusion that the injuries were the "proximate cause," they would neglect to inquire whether there was any other cause of death, not proximate, but efficiently contributing. As was said before, under this policy, and upon the facts in proof, there was no question of proximate or remote cause, but only whether there were

two co-operating causes, or only a sole cause. There are undoubtedly many passages in the charge which plainly indicate the correct rule that plaintiffs could not recover unless the jury were satisfied that the accidental injury was sufficient of itself to cause death to a healthy man; but upon the other hypothesis, which the evidence warranted, namely, that the fall produced a shock which called for responsive action from the heart, which it was too weak to give efficiently, the general effect of the charge failed, in our opinion, sufficiently to impress upon the jury that, if the disease thus contributed to cause death, plaintiffs could not recover. In other words, having reached the conclusion that the injury was the "active, efficient, procuring cause"; that the blow was, as plaintiffs' expert said, "the initiative,"—the jury, under the instructions given them, would be likely to trouble themselves with no further question as to any subsidiary cause. It will be sufficient to cite two passages from the charge. After setting forth the issues and the contract, the court began its statement of the "law as applicable to such a condition of affairs as exists here" by reading from the opinion in Freeman v. Association, supra, which he informed the jury was "a clear statement of the law." The passage thus read and given to the jury in this case as the headlight to their deliberation is as follows:

"*The principal question * * * is,* what kind of cause is to be deemed *proximate,* within the meaning of the policy? *Where different forces* and conditions *concur* in producing a result, it is often difficult to determine which is properly to be *considered the cause,* and in dealing with such cases the maxim, '*Causa proxima non remota spectatur,*' is applied. But this does not mean that the cause or condition which is nearest in time or space to the result is necessarily to be deemed the approximate cause. It means that *the law will not go further back* in the line of causation than to find the *active, efficient, procuring cause,* of which the event under consideration is a natural and probable consequence in view of the existing circumstances and conditions. *The law does not consider the cause or causes,* beyond seeking the *efficient, predominant cause,* which, following it no further than those consequences that might have been anticipated as not unlikely to result from it, has produced the effect. An injury which might naturally *produce death in a person of a certain* temperament or *state of health* is the cause of his death, if he dies by reason of it, *even if he would not have died if his* temperament or *previous health had been different;* and this is so as well when death comes through the medium of a disease directly induced by the injury as when the injury immediately interrupts the vital processes."

The italicized portions illustrate the criticism above expressed. Subsequently in the charge, making a more specific application to the facts in this case, the court instructed the jury as follows:

"The accident must be the *actual, immediate, and proximate cause* of the death; and, if the proof convinces you that the accident caused Fulton's death; then the law is that the *policy would not be avoided, even though it be possible that the man was suffering from some other disease, which, to a certain extent, might have rendered his system less able to throw off the effects of the blow than if he had been a younger and more healthy man.*"

Neither of these passages from the charge are covered by exceptions taken at the proper time, but the qualification to the request above quoted is thus covered. Inasmuch as that qualification

is manifestly erroneous, and the passages last above quoted show that the charge as a whole was not such as to warrant a holding that the erroneous qualification could have worked no injury to the defendant, the judgment must be reversed and the case remanded for a new trial.