SKINNER *v.* COMMERCIAL TRAVELERS' MUTUAL ACCIDENT ASSOCIATION.

INSURANCE—INJURIES—CAUSE—EVIDENCE.

> *Held*, on review of the evidence in an action on an accident policy, that the question whether death resulted from violent and external injuries or from a chronic distemper was for the jury; also, that recovery could not be refused on the ground that the insured had a disease produced by the injury or any complaint that did not proximately cause his death.
>
> 190 Mich.—23.

Error to Wayne; Hosmer, J.  Submitted October 27,
1915.  (Docket No. 174.)   Decided March 30, 1916.

Assumpsit by Minnie Skinner against the Commer-
cial Travelers' Mutual Accident Association, a foreign
corporation, upon a policy of insurance.  Judgment for
plaintiff.  Defendant brings error.  Affirmed.

*Walters & Hicks,* for appellant.

*Abbott & Abbott* (*Selling & Brand,* of counsel), for
appellee.

Moore, J.  This is an action on an accident and
health insurance certificate issued to Harold H. Skin-
ner, now deceased.  The certificate was issued January
22, 1904.  It insured "against personal, bodily injuries
effected during the continuance of membership and this
insurance through external violent and accidental
means," to wit:

"(1) In the sum of twenty-five dollars per week,
against loss of time, not exceeding 52 consecutive
weeks, resulting from bodily injuries effected through
means as aforesaid, which shall, independent of all
other causes, immediately, wholly, and continuously
disable him from transacting any kind of business.
*   *   *

"(6) Or if death shall result from such injuries
alone, and within three calendar months, the associa-
tion will pay the sum of five thousand dollars to his
wife, Minnie Skinner.   *   *   *"

It is the claim of the plaintiff that the insured had
an accident on the 14th day of July, 1913, which caused
his death on the 28th day of September, 1913.  This
suit was brought upon the certificate of insurance.
From a verdict and judgment in favor of the plaintiff,
the case is brought here by writ of error.

The errors assigned may be grouped as follows:

(1) A verdict should have been directed because

there is no evidence that the death of the insured was caused by his injuries.

(2) That a new trial should have been granted because the verdict was against the weight of the evidence.

(3) Because of errors in the admission of testimony.

(4) Because of the argument of counsel.

(5) Errors in the charge of the court.

Groups 1 and 2 may be considered together. The record discloses that from the time the certificate of insurance was taken in January, 1904, until July 14, 1913, Mr. Skinner was in good health and had required the services of a doctor but once, and then for an illness that lasted but two days. This was in 1906 or 1907. Deceased wrote the defendant as follows:

"DETROIT, MICH., 7/23/13.

"The Com. Travelers' Mut. Acct. Ass'n of Am.,
    "Utica, N. Y.
"*Gentlemen:*

"On Monday, July 14, 1913, I was packing my samples. The cases weighing about forty to fifty lbs. In lifting one of them, I slipped and strained myself. I noticed afterward it pained me severely and caused a swelling in my left groin. It was so bad I could not stand it. I called on Dr. L. J. Lennox, 32 Adams Ave. West, Detroit, Mich. He has been tending my case ever since. He says it is a rupture. Kindly write him for full particulars.

"Yours very truly,
                "HAROLD H. SKINNER."

Dr. Lennox was sworn as a witness. His testimony was in part as follows:

"I am 64 years old.   *   *   *   I have known Harold Skinner since he was a boy, over 35 years. I have no distinct recollection of treating him, unless it was previous to that time, until last July 14, 1913, when he came to see me at my office and I made an examination of him. He complained of suffering a great deal of pain and located the region of the pain, and I consequently made an examination. I examined him at my

office. I examined his abdomen and hip. There was a swelling in the left region of the abdomen, low down, and also some bruises on the left hip—discoloration. The bruises must have been caused by something which struck him or that he struck against something—by some external violent force. There was a swelling on the left inguinal region as large as a hen's egg, I should say, or possibly a little larger—not of course exactly that shape. That was a rupture. A rupture is an opening forced through the wall as the cavity in this case, allowing the intestines to protrude through, causing the swelling. He complained of pain near the lower part of the abdomen and in the bladder and perineum. The perineum is the lower or bottom or floor of the lower pelvis; that is, the space between the rectum and the testicles, and the prostatic gland. I don't remember that I took his temperature. I was examining the skin. I saw no evidence of any rise of temperature. I do not think it was necessary to take his temperature because of his condition. I did not think he had a temperature. I do not know that I would say that I could positively tell whether that was a recent hernia or an old one. I don't know that I could positively swear that there had not been a pre-existing trouble from the examination had at that time, although when I found that rupture there I asked him if he had ever had any trouble of that kind. I informed Mr. Skinner at that time that it was a rupture. I told him to rest and keep quiet. I think I ordered some cold applications on there for a little while, and as soon as the soreness was out to get a truss put on. He explained to me how the condition which I discovered arose and when it arose. He was an exceedingly emaciated man and always had been as long as I had known him, since boyhood. He was very, very thin and bony, very light, no fat, and very slim muscles.

"Q. Assuming, doctor, that Mr. Skinner was a traveling man for a clothing house and carried his samples in a trunk and that his samples were packed in telescopes weighing from 40 to 50 pounds each, and that those telescopes were packed one against the other in a trunk, and that it was necessary for him to lift these telescopes and put them in the trunk, and that in doing so one of these telescopes fell or that in doing so he

slipped, and he either struck himself against the edge of the trunk or one of the telescopes fell on him in the region of his groin, would you say that the appearance that you discovered there on the 14th day of July, 1913, could be caused in such a fashion as that? (Objected to as immaterial.)

"*The Court:* I don't want to bring the doctor back; note an exception.

"*A.* I would say that without any doubt his discoloration and bruises could be caused in that way by the falling of a telescope.

"*Q.* How about the hernia?

"*A.* Well, I consider that it is quite probable that if he slipped and fell that in so doing he might strain himself in such a way as to produce that rupture the same as from overlifting; not from the direct blow of the telescope as much as from the strong effort to save himself from the fall.

"*The Court:* That is, the strain on his part?

"*A.* Yes, sir.

"*Mr. Selling:* From what you saw that day could you say in your opinion whether Mr. Skinner had suffered an injury—a bodily injury through strain and violent means? (Objected to as incompetent and immaterial.)

"*Q.* Solely upon what you saw?

"*The Court:* I think that is proper, unless you have some authorities to the contrary.

"*The Court:* It is not possible that it could have occurred from internal means, is it, doctor?

"*A.* No, sir.

"*Q.* It could only have occurred from external means?

"*A.* In my opinion.

"*Q.* And with some violence?

"*A.* Yes; to produce that.

"*Q.* In your opinion, doctor, was this injury through the strain and violent means to which you testified because of the condition that you found on that day?

"*A.* Why, yes; I would consider it very plausible that that accident as he described it could cause that condition.

"*Mr. Walters:* I object to that—the portion of it

that the accident as he described it—as incompetent and immaterial and move to strike that portion out.

"*Mr. Selling:* I am willing that portion should go out. I will put it this way: Could the accident, as I have described it, cause the injury such as you found?

"*A.* Why, yes; it would be the same thing—no matter who I got the information from.

"*Q.* From what you yourself saw, what in your opinion was the cause of the discoloration or bruise that you have described and the hernia—eliminating anything that was said to you?

"*A.* My opinion was that the bruises were caused by some external injury or violence and rupture from some severe strain, not knowing anything about how it was caused; that would be my guess.

"*Q.* You have told us that he had difficulty in urination?

"*A.* He told me; yes, sir. Of course I had only his word for that.

"*Q.* And also you referred to tenderness in the perineum?

"*A.* Well, that is also what he told me, that is all.

\*    \*    \*

"*Q.* The evidence so far in this case established, doctor, that he died on September 28, 1913, and that prior to his death there was an abscess in the perineal cavity and that the immediate cause of his death was septacemia or blood poisoning as a result of absorption from that abscess., \*    \*    \* In your opinion would there be a relation between the death from septacemia as the result of the abscess in the perineal region, the death occurring on or about the 28th of September, 1913, and the conditions which you found in July previous?

"*A.* Well, the fact that there was pain, as I said before, and soreness in that region when he came to me after the accident, it would look very probable that that would be the first history of the condition resulting—whether it resulted from that I could not positively state.

"*Q.* You of course could not state that, you did not see him after the 30th of July.

"*A.* No, sir.

"*Mr. Hicks:* I move to strike out the doctor's words

as incompetent and immaterial—the words 'after the accident.'

"*Mr. Selling:* I will consent to that. I will put it —after injury—after the condition that you saw?

"*A.* Yes, sir.

"*Q.* On the 14th day of July. You have an opinion on the subject have you not, doctor, of whether his death from septacemia following an abscess in that region—the perineal region, was directly connected with the conditions that you found in July?

"*A.* Well, my opinion would be that it was reasonable to think that it might be—that it might be traced back to that point."

Cross-examination, by Mr. Hicks:

"*A.* * * * I did not know at the time that I examined him that there was a stricture of the urethra. He had a bruise, a discoloration of the upper part of the left thigh, a slight discoloration. It was quite black and blue.

"*Q.* Just a black and blue spot?

"*A.* On the upper part of the leg and on the point of the hip.

"*Q.* There were a couple of black and blue spots, one on the side of the leg?

"*A.* Possibly there were more. There were spots on the left enlargement of the abdomen, the upper part of the left thigh and the point of the hip that was discolored.

"*Q.* That was all the evidence that there was of any bruise?

"*A.* That was the only evidence of the bruise that I saw.

"*Q.* How large an area was discolored?

"*A.* Well, it was in several small areas, altogether enough to cover approximately the palm of my hand combined.

"*Q.* The skin was not broken in any place?

"*A.* The spots extended over the upper part of the thigh, up near the joint, not quite up to the top of the pelvic bone or the hip bone. There was no abrasion there; there was just a little discoloration on the left margin of the abdomen, low down near the groin (indicating). It was discolored blue. This tumor that I

found there at that time stood out there a little larger than half a hen's egg.

"*Q.* I believe you stated in your direct examination that there was no way that you could tell whether that tumor had existed prior to the time that you saw him or not?

"*A.* No; I don't think anybody could possibly tell whether it existed previously or not; it did not have the evidences of an old rupture, but still it might have occurred previously; there might have been a weak point there previously and I could not tell, nor nobody else.

"*Q.* Nobody else could tell whether it was a recent hernia or whether it was an old one?

"*A.* No; I don't think anybody could tell positively.

"*Q.* I believe you also said, doctor, that by no possibility could that hernia have been caused by a direct blow coming against the abdomen?

"*A.* Well, I did not quite put it that strong, I think.

"*Q.* It more probably came from a strain, as I understood him?

"*A.* Yes; more probably came from a strain than from a direct bruise. There is nothing about a hernia which will cause death, unless it becomes strangulated. The hernia standing alone, unless there is a history of strangulation, could not by any possibility have caused the death.

"*Q.* There is nothing about those bruises that you saw on the hip nor this bruise that you saw in the groin that by any possibility could have caused death?

"*A.* I would not expect it probable from them. He complained of pain all through the lower part of the abdomen, and also in the bladder and perineum. * * *

"*Q.* And would not the pain which you noticed in the perineum at that time be a great deal more likely to be due to the cancer than it would be due to any injury across the abdomen—any such injury such as he complained of?

"*A.* No; I would not think so; I would think the injury he received was such, as he described it to me, would produce the pain that he had—from the description of the injury which he described to me I would consider that could produce all the pain—not saying

that it did, but I say it could produce all the pain he complained of.

"Q. And the other condition which I have just outlined to you might have caused the same pain, might it not?

"A. It might have caused a part of the pain; yes, sir.

"Q. It might have caused a part of the pain?

"A. Yes, sir; it might.

"Q. And if the cancer had been well developed at that time it might have caused the entire pain, might it not?

"A. Well, it would have to be pretty well advanced to affect the lower part of the abdomen and the side, of course.

"Q. Now the stricture of the urethra might also have caused that pain, might it not?

"A. Well the stricture of the urethra does not usually cause much pain, except as it holds back the urine in the bladder, and then it causes pain.

"Q. It might have caused a pain, except that which you found in the immediate locality of the black and blue spot, might it not?

"A. It might have what?

"Q. Have caused all the pain which you saw evidence of except that in the immediate vicinity of the black and blue spots that you have named?

"A. Well, the black and blue spots and the rupture which I found would cause a lot of that pain down in the lower part of the abdomen.

"Q. They caused pain and the stricture might have caused pain also, might it not?

"A. Not up there.

"Q. Not up there?

"A. No.   *   *   *"

Redirect examination, by Mr. Selling:

"Is there any branch of medicine that doctors know less about conclusively than cancer?

"A. Well, I guess it is among the branches that we have to learn a great deal about yet. From the appearance of a cancer, no one, so far as I know, is able to tell its duration or what its cause actually is. The principal cause of cancer is supposed to be either a

constitutional condition or a local injury or bruise—
something of that kind as the starting point. They
are often traced, in getting a history of them, to some
trauma, not always. Quite often—perhaps not as
often as some other causes—unknown causes."

Several witnesses who had known Mr. Skinner in-
timately testified to his general good health. His wife,
an actress, who had lived with him for a long time,
was sworn as a witness. She testified to his general
good health, that the last time she saw him prior to
his injury was in May at their home, and that prior
to that time Mr. Skinner— '

"did not have a rupture that I know of. If he had,
I think I should have known it. With reference to his
having any injury or any trouble which would cause
painful urination, he never made any complaint of that
sort to me prior to the 14th of July, 1913. I never
knew of his using any instrument of any kind to help
himself in that regard prior to July 14, 1913. I cer-
tainly should have known of it if he had."

It was the claim of defendant that the death was
not caused by the injury, but that deceased was suf-
fering from syphilis, that the hernia had in all prob-
ability existed for some time before the injury, that
the injury and death both occurred while Mr. Skinner
was affected by disease, and that "the death was due
to the combination of difficulties set up by the cancer
and prostatic abscess which resulted in pus absorption
and terminal broncho-pneumonia." Testimony was in-
troduced tending to support this claim.

Dr. Brownell, as a witness for the plaintiff, testified
as to the cause of the death, and that in his opinion
the injury might have caused it. On his cross-exam-
ination occurred the following:

"*Q.* I will ask you this, doctor: You distinguish
between a prostatic abscess and a perineal abscess,
don't you?
"*A.* Yes.

"*Q.* They are entirely distinct and separate things?

"*A.* Yes, sir.

"*Q.* \* \* \* All that you have said about the cause of death of this man would be entirely wrong if it developed upon the post mortem, which was held after his death, there was no perineal abscess?

"*A.* Yes, sir."

It is strenuously insisted that as the autopsy showed there was no perineal abscess, but that deceased was suffering from a prostatic abscess, that the testimony of doctors Brownell and Lennox was valueless as to the cause of death, and their testimony should have been stricken out. It is also claimed that the testimony disclosed the existence of a cancer not only at the time of death, but at the time of the injury.

The record discloses a diversity of views on the part of the doctors as to when a perineal abscess ceases to be one and becomes a prostatic abscess, and *vice versa.*

The claim that deceased had cancer which caused his death is largely dependent upon the evidence of what was disclosed by an analysis of tissues removed from the body after it was embalmed, which analysis was made after Mr. Skinner's body was cremated. The doctors for the plaintiff, and some of those for the defendant, did not diagnose the case as one of cancer. Dr. Sill, who assisted in the autopsy, and was a witness on the part of the defendant, testified on the cross-examination:

"I never knew about there being any claim of cancer in the case of Harold Skinner until after his body had been burned at the Crematorium. So far as I am concerned, I did not discover during that autopsy that there was a cancer, and so far as I know there never was any suggestion on the part of anybody, physician or layman, that there was a cancer, until after Mr. Skinner's body had been destroyed by fire."

In disposing of the motion for a new trial the learned circuit judge expressed himself as follows:

"The testimony in this case would tend to show that Harry Skinner, deceased, was a commercial traveler, and that he pursued his occupation until a comparatively short time before his death. Save that he was and had been for a long time emaciated, there is no evidence whatever to suggest that he was in ill health until shortly before he called upon Dr. Lennox. None of the firm or corporation by whom he was employed, none of the customers upon whom he called from time to time, and none of his associates were called to show that there was such a condition otherwise than normal in the deceased up to the time that it is claimed he suffered an accident. From the time of his calling upon Dr. Lennox, to the time of his death, his condition grew rapidly worse. It does not seem to me probable, under the circumstances of the case, that there should have been such a rapid decline had not the primary cause been some kind of an accident; and under the circumstances as given by the witnesses upon the stand, I am satisfied that there was evidence which should carry the case to the jury. It is possible that if it had been submitted to me, that I might have reached another conclusion. I do not say that I would; but where the case belongs to the jury I am not prepared to say that the weight of the evidence is so great in the case at bar that the court should now set aside the verdict and grant a new trial."

To justify a directed verdict it would be necessary to discredit the testimony offered on the part of the plaintiff, and to assume that the testimony of defendant's witnesses was true. This feature of the case was for the jury. The claimed errors in the admission of testimony and the argument of counsel have been examined. We think them without merit.

Did the court err in his charge to the jury? The judge was requested to charge:

"(2) If you find from the evidence that the insured, Harold Skinner, at the time of the claimed accident, that is, on July 14, 1913, was suffering from a preexisting disease of any kind, then under the terms of the policy of insurance sued upon, the plaintiff is not entitled to recover.

"(3) If you find from the evidence that the insured, Harold Skinner, on July 14, 1913, and prior to the time of the claimed injury, had a hernia, then under the terms of the contract of insurance, the plaintiff is not entitled to recover, and your verdict must be no cause of action."

These requests are based upon the language of the policy contract reading:

"The insurance under this contract shall not extend to or cover disappearances, or injuries whether fatal or disabling, of which there is no external visible mark on the body of the insured; nor extend to or cover accidental injuries or death resulting from or caused directly or indirectly, wholly or in part, by hernia, fits, vertigo, somnambulism, or disease in any form, or while affected thereby."

Counsel concede they have been unable to find where this particular provision has been before the court for construction, but insist that the provisions of the certificate in terms prohibit recovery if the insured at the time of the injury was affected by disease, and cite many cases to show that it is no part of the function of the court to make contracts for the parties.

As to this feature of the case the judge charged the jury as follows:

"If you find that Mr. Skinner was not suffering from any disease at the time he was injured, and that he was actually injured while he had a predisposition toward a disease, the fact that as a result of the injury and the predisposition to such disease Mr. Skinner died, your verdict would be for the plaintiff.

"Any disease which Mr. Skinner may have had at the time of the injury or previous which did not cause directly or indirectly or in any way contribute to his death should not be considered by you in determining the issues in this case. I think that is so, gentlemen of the jury, with reference to the question of syphilis because the testimony of all the medical witnesses, I think, is that syphilis, if you find that it existed, in no case or question produced the death. The theory on the

one hand is that he died of a cancer—of an ulcer or abscess in the prostatic gland which had been infiltrated by a cancer—the theory of the defense, and the theory of the plaintiff that he died of an ulcer or abscess which was caused by the injury which he received at the time he fell, if you find that he fell or was struck accordingly as you find it to be, and so I charge you, being I think the plaintiff's twenty-fourth request: Any disease which Mr. Skinner may have had at the time of the injury or previously which did not cause directly or indirectly or in any way contribute to his death should not be considered by you in determining the issues in this case. * * *

"If you find from the evidence that the abscess on the prostate gland was caused from an infection coming through the walls of the intestine, then under the undisputed evidence in this case such infection would be caused by the hernia, and the plaintiff would not be entitled to recover. That is unquestionably so, gentlemen of the jury, if you find that the abscess was caused by cancer and not by the blow, if you find he received a blow, if you find from the testimony that whatever abscess there was that caused death was the direct result of the accident, why unquestionably in that case the plaintiff would be entitled to recover, if that was the sole cause; but if the cancer which is claimed by the defendant to have existed prior to that time existed and contributed to his death unquestionably, gentlemen, you must find a verdict for the defendant, because then it would not be the sole cause, and any blow he received would not be the sole cause, and he can only recover where the accident was the sole cause.

"Mr. Walters: I think, your honor, the jury might get the impression from what you said before, and from what you say now, that in order for the defendant to make out a defense it would have to show that a cancer existed prior to the time of the alleged accident; and I do not think it would be necessary to show that. If death resulted from the cancer and if the accident did not bring on the cancer—in other words, it is not necessary for the defendant to show as a matter of fact that it antedated July 14th, if it caused death.

"*The Court:* Well that doubtless is so, gentlemen of the jury, but I think that is rather academic.

"*A Juror:* Has it been shown by the testimony that cancer existed before?

"*The Court:* The testimony I think with reference to that was that he thought it existed prior to that time.

"*Mr. Selling:* Dr. Morse made a microscopical examination, and that is the first he found of the cancer, and he gave an opinion as the test turned out; that is all the evidence there is. Dr. Ballin never saw the cancer, never knew it, except by a hypothetical question as to that.

"*The Juror:* The examination of Dr. Morse was made after death, was it not?

"*The Court:* The examination of Dr. Morse was made after death.

"*Mr. Walters:* Other physicians testified in answer to a hypothetical question that that cancer as it was described from the result of the post mortem would exist for several months, placing it back of July 14th.

"*The Court:* That is undoubtedly so. It is not for me to say whether or not there was a cancer or how long the cancer was there.

"*The Juror:* He could not tell by the naked eye, he had to have a microscope to tell about the cancer— after the body was burned.

"*Mr. Selling:* It was made after the burning of the body, but he took his sample at the post mortem just before cremation.

"*Mr. Walters:* A small sample of the tissue for testing purposes.

"If, under all the testimony in this case, including the testimony of the medical experts, you reach the conclusion that the evidence introduced is as consistent with the claim of the defendant that the death of the insured was not due wholly and entirely to accidental injuries received on July 14, 1913, but was contributed to by illness as it is to the theory of the plaintiff, viz., that the death was due wholly to injuries received from accidental means on July 14, 1913, your verdict will be for the defendant of no cause of action. * * *

"If the plaintiff is entitled to recover at all, she would be entitled to recover the sum which the counsel has claimed, namely $5,352.09, but whether she is en-

titled to recover at all is, gentlemen of the jury, wholly and peculiarly a question for you.

"*Mr. Selling:* If the court please, in order that there may be no error in the case and to give the defendant the benefit of any doubt upon the question of law, we are willing your honor should instruct the jury that unless the cancer was the result of the accident and the cancer caused the death, that we are not entitled to recover. But if the cancer was the result of the accident, we are.

"*The Court:* I think I have substantially covered that.

"*Mr. Selling:* I want to be sure of that.

"*The Court:* All right, you are sure of it now I think."

In *Vernon* v. *Traveling Men's Association,* 158 Iowa, 601, 606 (138 N. W. 699, 700), the policy contained the provision:

"Nor shall this association be liable * * * for any * * * benefit for accidental death, loss of limb, sight, disability resulting wholly or partially, directly or indirectly, from any of the following causes, conditions or acts, or when the member is under the influence or affected by any such cause, condition or act, to wit, disease, bodily or mental infirmity, etc."

In affirming a judgment in favor of the plaintiff, the court said in part:

"While what is known as article 6, section 6, of the contract is somewhat obscure, it would not do to hold that no recovery could be had on the certificate if the assured was afflicted with any disease or bodily or mental infirmity, either at the time he received his injuries or at the time of death. Very few persons are free from some form of disease or bodily infirmity, and if a condition of that kind, without reference to its causal connection with death, should be held a bar to recovery, the proposed insurance would be a delusion and a snare. Such conditions as we here find are to be construed most strongly against the insurer; and, taken together, we think they must be held to apply to such diseases or bodily or mental infirmity

as in some manner contribute, directly or indirectly, either to the injury or to the death.   Unless there be such contribution, then the death, loss of limb, etc., cannot result either wholly or partially, directly or indirectly, therefrom.   In other words, the disease or bodily infirmity must be a cause or one of the causes of the injury or death, and it is not enough to defeat recovery to show either disease or bodily or mental infirmity. *Binder* v. *Association*, 127 Iowa, 25 [102 N. W. 190].   For this reason the trial court did not err in the instructions given or in refusing to give the third instruction asked."

In *Illinois Commercial Men's Association* v. *Parks*, 179 Fed. 794 (103 C. C. A. 286), the by-laws were made a part of the contract; one of them provided there should be no liability in case the injury occurred "while the injured member was under the influence of or affected by * * * disease," etc.   In construing this language the court said:

"We are of opinion, therefore, that the ultimate issue of liability under this contract, in the event of a finding of accidental injury, is not whether such injury was the proximate cause of death, but whether it was the efficient cause, without the intervention of pre-existing disease or bodily infirmity as a co-operative cause of death—within the extended line of authorities cited under analogous provisions, whereof the following are deemed sufficient examples: *National Masonic Acc. Ass'n* v. *Shryock*, 73 Fed. 774, 775 (20 C. C. A. 3); *Commercial Trav. Mut. Acc. Ass'n* v. *Fulton*, 79 Fed. 423, 426, 430 (24 C. C. A. 654); *Sharpe* v. *Com. Trav. Mut. Acc. Ass'n*, 139 Ind. 92, 93, 95 (37 N. E. 353); *Binder* v. *National Masonic Acc. Ass'n*, 127 Iowa, 25 (102 N. W. 190, 194); *White* v. *Life & Acc. Ins. Co.*, 95 Minn. 77 (103 N. W. 735, 736, 884, 5 Ann. Cas. 83).   An issue of fact under these provisions was presented by the evidence, and instructions in conformity with the foregoing view became needful for its submission entirely apart from the primary question whether the fall resulted from accident or disease.   If the jury found from the evidence that

the immediate injury was not caused accidentally, such finding would leave no further inquiry open under the policy, requiring a verdict against recovery. If they found, however, that the evidence upon that question was in favor of accidental cause for the fall, the other above-mentioned issue of fact was not involved therein, but remained for determination under conflicting evidence upon one and the other phase of contract liability; so that explicit instructions of law were essential, both for interpretation of the contract and for application of the testimony thereunder in accord with these propositions which are deemed applicable: That the burden of proof was on the beneficiary under the policy, not only to establish that the injury from which death ensued was accidental, but that such accidental injury was the sole cause of death, independently of any pre-existing disease or bodily infirmity as contributory cause thereof; that if the testimony further established that the assured was then affected by disease or bodily infirmity, which caused his death, either directly therefrom, or indirectly, as its natural result ensuing such accidental injury, so that the accident would not have caused his death without such pre-exising disease or infirmity, the contract exempted the association from liability therefor; that recovery was not authorized under the contract for death caused partly by disease and partly by accidental injury (*National Masonic Acc. Ass'n* v. *Shryock, supra; Commercial Trav. Mut. Acc. Ass'n* v. *Fulton, supra*) ; that if the evidence, however, established not only the fact of accidental injury, but the sufficiency thereof to cause the death independently of other causes, and the testimony in reference to pre-existing disease or infirmity failed to establish such disease or infirmity as indirect or contributory causes of such death, liability therefor was within the contract terms, and recovery was authorized."

The case was carefully tried. We find no reversible error.

Judgment is affirmed.

STONE, C. J., and KUHN, OSTRANDER, BIRD, STEERE, BROOKE, and PERSON, JJ., concurred.