### Horace R. Kelly v. Caroline Freedman.

*Promissory note—Accommodation indorsement—Evidence.*

1. In an action on a promissory note against an indorser thereon the consideration for the indorsement is a material question if plaintiff is bound by the equities existing between maker and indorser. And it can hardly be immaterial, if one of the principal questions in the case is whether he is so bound or not.

2. The consideration for an indorsement and the good faith in using it may not be important questions where there are no original equities and the indorser is bound to make the paper good at all events. But if the maker had no right to give it currency, no one can get any better right unless he takes the paper under circumstances that would legally exonerate him from equities that bind his assignor.

3. A surety ought not to rest in a worse position than his principal. How far a creditor can legally agree with his debtor not to look to him until he has exhausted his remedy against an accommodation surety, and how far such creditor could claim as a bona fide holder against one who has been defrauded into becoming a surety—Q.

4. The jury must decide all questions of fact, and where a witness has made varying statements and then selects one as the truth, the jury is not bound to accept that one and leave the other out of view; and in considering which is most probable they can regard the conduct of the parties.

Error to Wayne.   (Chambers, J.)   Jan. 30.—April 9.

ASSUMPSIT.   Plaintiff brings error.   Affirmed.

*Moore & Moore* for appellant.

*Adolph Sloman* for appellee.

CAMPBELL, J.   Defendant is sued as endorser of a promissory note for $3750 dated April 7, 1883, made by Sampson & Freedman and payable to their own order, endorsed by them without recourse as first endorsers, at four months. The note bears no place of dating, and was made payable at a bank in Detroit.   The makers, at its date, were tobacco dealers in Chicago, and defendant is a widow, the aunt of Freedman, one of the makers, and lives in Detroit.   Plaintiff, who is doing business in New York individually but under a firm name, claims to have received the paper a few weeks after its date from the Chicago firm, who were his debtors.

Mrs. Freedman defends on the double ground of fraud in the procuring and use of the paper, and of illegality as a Sunday contract.   And she claimed in the court below, and was sustained in her claim by the jury, that plaintiff did not take the paper under circumstances which would make him entitled to enforce it against her discharged of her defenses.

The several assignments of error all relate to two sets of inquiries: *first*, as to the validity of the paper and the mutual relations of Mrs. Freedman and the makers; and *second*, as to plaintiff's claims to protection as a holder in good faith.

Upon the origin of the endorsement as executed on Sunday there was no question. Plaintiff's own witness William Freedman, testified on cross-examination that he went to the room of his aunt, who was at the time in bed indisposed on Sunday evening, and by various statements procured her signature on the back of a blank form of promissory note, of which no part was filled up, and which was not signed, and that on the same night he went to Chicago with it, and that he filled it out the next day. Another similar instrument not involved in this suit was prepared in the same way. There was also testimony to go to the jury, which seems not open to question (although this we need not consider), that the next day she revoked the authority to use it, before it had become transferred to any holder for value; and there was further testimony that the Chicago firm acknowledged the receipt of this prohibition and promised not to use the paper and did not use it in the course of business. William Freedman testified to an attempt to negotiate the note at once, but that the person with whom they dealt preferred to and did furnish money on different security.

The questions of evidence presented refer directly or indirectly to the reception of testimony concerning the equities between the makers and endorser, and the circumstances and considerations connected with their dealings. And as this subject was somewhat fully discussed by the witnesses it requires attention.

It was urged by plaintiff that the mere fact that the defendant's signature was appended on Sunday would not prevent the note being made valid by subsequent facts. And he introduced testimony to show that in fact the relations of the parties were such that in giving this paper Mrs. Freedman was only providing means which she was really bound to furnish to satisfy her own obligations to her nephew and his partner, and that, although in form accommodation paper

it was not so in fact. But he now claims that this was imma-
terial and therefore not open to complete investigation and
answer by the defense, although he himself began the
inquiry.

We cannot understand on what principle such inquiries on
consideration can become immaterial unless on the assump-
tion that plaintiff is not bound by such equities. But this
was necessarily one of the important questions in dispute.
If there were no original equities, and if defendant was
bound to make the paper good at all events, the plaintiff's
title might not require the same degree of support in consid-
eration and good faith that might otherwise be very essen-
tial. But if it was against honesty and good faith for the
makers of the note to give it currency, then no one else could
acquire any better right unless receiving the paper under
circumstances which would legally exonerate him from the
equities which his assignors could not evade.

The facts which defendant sought to rely on were partly
shown by plaintiff's witnesses on cross-examination, and partly
by other testimony. They tended to show that when she
signed the endorsement defendant was out of health and to
some extent affected by anodynes, that she was deceived by
her nephew concerning his financial condition, and the pur-
pose for which the paper was to be used, and the sum which
was to be provided for, and that advantage was taken both
of her condition and of her ignorance of such business.
And in answer to so much of plaintiff's testimony as set up
any consideration existing against her, she not only contra-
dicted the account given by plaintiff's witnesses concerning
the transaction of Sunday night, but she also introduced tes-
timony which tended to show that there was no truth in the
showing of consideration. There was enough to go to the
jury not only to show that the endorsement was entirely for
accommodation and without consideration, but that the
paper was obtained by fraud and used without right.

None of the testimony objected to, the ruling on which is
now relied on for reversal, was improperly dealt with if the
subject was open to proof at all. The arguments of coun-

sel do not seriously urge any ground outside of this. And if there was no right in Sampson & Freedman to ask this paper as equitably due to them, it was not only purely accommodation paper, but used if defendant's testimony is believed, for directly fraudulent ends.

The charges given or refused, on which errors are alleged, bore on the question of plaintiff's good faith in receiving the note as collateral security. One error alleged is not sustained by the record. The charge made that Kelly was not to be treated as a bona fide purchaser if he was not to release Sampson & Freedman if he failed to collect of defendant, was not confined to the note, as the printed record suggests, but included the account also, while the exception and assignment confine it to the note. Had it been confined to the note, however, it would be worthy of some consideration how far it is proper for a creditor to agree with a principal debtor not to look to him until he has pursued an accommodation surety and exhausted his remedy against the surety, and how far such a transaction would give the creditor the claims of a bona fide holder against a surety who has been led to enter into that relation by fraud. The law does not favor dealings which will put the surety in a worse position than the principal, and such an arrangement would be unjust, whether legal or not. The case does not require us to decide on its legality.

As counsel for defendant does not dispute the doctrine that a person who takes a note merely as collateral security is not a bona fide holder, we need not discuss the law on that question. And inasmuch as this transaction was had in New York, if anywhere, the law of that state certainly would not favor the plaintiff. The error urged on the argument was not the legal proposition but the absence of any testimony to which it could apply. The court did charge very broadly that acceptance of such a note in payment would make plaintiff a bona fide purchaser. We are not informed whether the jury found the paper was taken as collateral, or found there was no honest taking without notice.

It is not our duty to decide upon the facts in the case; it was for the jury to determine all such questions. And where

a witness varies in his statements and then undertakes to select one of his accounts as the one he means to stand by, we cannot hold the jury bound to determine that he tells the truth in that, and that his other testimony is to be left out of view. If there was any testimony given in the case, at any time, which would indicate that this paper was taken as collateral security and not as absolute payment, we cannot say the jury could not properly so find. If the appearance of the witnesses on the stand suggested as much room for difference of opinion as the written report of it indicates was possible, there was sufficient variance to require the jury to form their own conclusions. As facts are often important in construing conduct, and may sometimes be more convincing than assertions, it cannot be said that the record furnishes no basis for submitting the question of a holding of the paper as collateral to the jury. In our opinion there were such facts as well as statements in the testimony as to justify such a submission. Without going at large into the disputed merits, a few references will, we think, be sufficient to illustrate it.

William Freedman, who got the paper signed in blank from defendant, stated that he got it on Sunday, April 6th, and filled it up and dated it the next day as April 7th. As Sunday was not April 6th but April 8th he must have antedated it. After an ineffectual attempt to get it discounted by one Leeson who would not purchase it, it remained in the possession of Sampson & Freedman for a period of several weeks, the witnesses differing considerably in their various statements. In the meantime they failed. The case is not clear as to what arrangements this failure led to concerning firm debts except as it is partially shown concerning plaintiff, and one or two other interests. The testimony of plaintiff is to the effect that immediately on the failure they telegraphed him, and he at once went to Chicago. While there, he says he found they had executed and filed a chattel mortgage on the store and fixtures. In the action then had at Chicago the law firm of Moses & Newman were employed. In a deposition taken in the cause, William Freedman, as his testimony was taken down when examined, appears to have

testified that those persons then and subsequently were acting as plaintiff's attorneys, and this fact became material upon some questions of notice. After the proceedings to take the examination were closed, and when defendant's counsel were absent, the tenor of his deposition was changed in one place so as to deny that they were plaintiff's attorneys (although in another part not altered he affirmed it positively), and to deny what he had before stated, that the note was given plaintiff as collateral. As this made substantial changes when the witness was not in reach of further cross-examination, and defendant's counsel seems to have had no seasonable notice of the change, its propriety was very doubtful, and at any rate the jury had a right to consider the separate and contradictory statements of this witness on both of these points, and take the statement which seemed to them most probable. And in determining this all the acts and conduct of the several parties became significant.

Plaintiff testifies that the lease was transferred to him and that without foreclosure he assumed to deal with the store and fixtures as his own and leased them to one Jacobson, whom he helped to set up in business, and who, thereafter, sold similar goods of which he rendered accounts to plaintiff, who however says Jacobson is not his agent. William Freedman went into the same store, as he says, in Jacobson's employ, and Sampson was employed by plaintiff. Although pressed, plaintiff did not state either the amount of the chattel mortgage, or what was the real or agreed value of the lease and fixtures, or how far they went towards reducing his debt. This would bear with some force on the real purpose of the transfer of this note, whether it was more or less than the balance due him.

While he was in Chicago, after the failure, no reference was made to this note by anybody, and nothing is shown to have been done or asked concerning further provision for plaintiff. But after he returned to New York this note was sent to him, as claimed, on the unprompted action of Sampson & Freedman, through the law firm, who communicated with him, either as his own agents or firm agents. The note

was endorsed without recourse, and plaintiff says he sent it back to Newman because he thought this created doubt as to its goodness. That it was returned by Mr. Newman to plaintiff, and an explanation was also given by Mr. Sampson which indicated that Mrs. Freedman was good, and bound as between the parties, to pay the paper. No inquiry was made of Mrs. Freedman. Plaintiff's testimony claims it was received as payment, but he also swears that as Sampson & Freedman were makers and so primarily liable he did not consider the "without recourse" clause as affecting their liability, and expected to look to them if he did not collect the note ; and he also uses language in describing the credit which is at least open to the construction that the credit was not absolute on the account. He says : "Bills receivable, paid, we credited up to Sampson & Freedman, and charged bills receivable with it."

This does not seem to indicate a wiping out of the account before the paper was paid and all the facts and parts of testimony were open to comparison, to ascertain what the parties did mean. There was testimony indicating that plaintiff had notice through his attorneys, if they were his attorneys, of Mrs. Freedman's claims, which the jury could consider, and testimony that the note was taken as collateral, which they could also consider. They had also testimony that the transmission of the note was voluntary and not in pursuance of any agreement, and its method raised doubts about its character in plaintiff's mind. There was no testimony explaining what credit was given or whether any was given, for the property and lease transferred. The facts, on which there was some discrepancy concerning the prior and subsequent relations of all these parties and their attorneys, became important in determining the true condition of affairs. Upon the purpose of all these parties to make Mrs. Freedman primarily responsible for a debt on which she was apparently a mere surety, there is no concealment and the jury have found in her favor upon the original equities, and that she ought not to be held upon it.

In our opinion the case was properly left to the jury, and the judgment should be affirmed.

The other Justices concurred.