ABBOTT *v.* TRAVELERS INSURANCE CO.

INSURANCE—ACCIDENT INSURANCE—EVIDENCE—SUFFICIENCY.

In an action on an accident policy, on the issue as to whether insured's death was the result of an accident within the terms of his policy, evidence *held*, by a divided court, sufficient to take the question to the jury.

Error to Wayne; Lamb (Fred S.), J., presiding. Submitted April 22, 1919. (Docket No. 39.) Reargued January 28, 1920. Decided February 27, 1920.

Assumpsit by Edna S. Abbott against the Travelers Insurance Company, of Hartford, Connecticut, on a policy of insurance. Judgment for plaintiff. Defendant brings error. Affirmed, by a divided court.

*Vandeveer & Foster,* for appellant.

*Walters & Hicks,* for appellee.

STEERE, J. This action was brought by plaintiff as beneficiary named in an accident insurance policy for a maximum of $5,000, with accumulations for ad-

Previous diseased condition as affecting liability for death or injury from accident, see notes in 34 L. R. A. (N. S.) 445; 52 L. R. A. (N. S.) 1203; 6 B. R. C. 530.

Arterio sclerosis as affecting right to recover under accident policy, see note in 3 A. L. R. 1304.

vanced premiums, issued by defendant on May 1, 1908, to her husband, William S. Abbott, who during his lifetime was a resident of Detroit, employed for 23 years as an agent and adjuster for a fire insurance company, having supervision of its business in the State of Michigan. His death occurred at his home in Detroit on November 10, 1916.

At the time of his death Abbott was 51 years of age, a heavy set man 5 feet 8 inches tall, and weighed about 210 pounds. On the evening of October 24, 1916, he returned home from his office shortly before 6 o'clock and went upstairs to the bath room to prepare for dinner. On his way down he made a misstep or slipped at the landing of the stairs and fell two steps, striking heavily in a sitting position. His wife and son hearing the fall went to him but he told them to leave him alone, soon arose to his feet and went on down to the dining room without assistance, though indicating in his walk that he felt the effects of the fall. He took his seat at the table and ate his meal with them, after which he read the evening paper for about an hour, then took a hot bath and went to bed, sleeping until after midnight, when his wife was awakened and found him in pain, apparently in his neck and back to which she applied hot cloths. He remained in bed the next day and slept much of the time. The following day he appeared somewhat stiffened and lame from the effects of his fall but went to his office and attended to some business. He returned home early and his wife found him in bed shortly after one o'clock. The next morning his condition was such that she called their physician, Dr. Simpson, who attended him professionally until he died on November 10, 1916, 17 days after the accident. A *post mortem* examination was made by Dr. Simpson, of which defendant's representatives, who had expressed a desire to be present, had no notice, and a subsequent

written request in its behalf for an autopsy under the terms of the policy deceased held was refused by plaintiff. She thereafter presented proofs of loss and claim as beneficiary under the accident policy, said proofs being accompanied by a verified statement of Dr. Simpson as attending physician, dated November 22, 1916, containing the following:

"5. State immediate cause of death: Portal obstruction.

"6. State predisposing or contributory causes of death, or complications, if any: Cirrhosis of liver, duration over 3½ years; cholangitis; fall, striking heavily and starting thrombosis of portal vein. *  *  *

"9. Was there a *post mortem* examination? If so, by whom? Give findings: Yes, by myself, Dr. Safford and Dr. C. R. Meloy. Gall stones—cholecystitis —cirrhosis of liver—ascites."

A previous death certificate by Dr. Simpson, of November 12, 1916, filed with the Michigan division of vital statistics, states:

"The cause of death was as follows: Cholecystitis and cholangitis—duration 2 weeks; cirrhosis of liver, duration 3 years .... mos. ..... dys. Contributory, a fall 2 weeks ago."

Defendant in reply to plaintiff's claim and proofs of loss gave notice of denial of liability under the terms of its accident policy issued to deceased, stating as a reason that "death was not the result of bodily injury effected through external, violent and accidental means independently of all other causes."

This action followed, with pleadings properly framed to present the issues which were tried by jury in the circuit court of Wayne county resulting in a judgment on verdict in favor of plaintiff for the amount of the policy.

Defendant, by plea with notice thereunder and proof upon the trial, claimed as grounds of defense that

deceased had violated the warranties in his application under which the policy was issued wherein he asserted that he had no other accident insurance in any company or association and was "in sound condition mentally and physically" when the policy was issued and renewed from year to year; that the beneficiary and representatives of the estate breached by refusal on request the provision in said policy giving defendant, on demand, a right to examine the person insured and opportunity to make an autopsy in case of death, and that death was not caused by an accidental injury independent of all other causes. The court only entertained the last-named defense, which was submitted to the jury as an issue of fact, against defendant's motion and request for a directed verdict, the jury being told in the court's charge that was the only one of its defenses upon which defendant relied.

Counsel for defendant strenuously insist that its other defenses were relied upon and proof was made as to them. The record contains a request to charge as to one of those defenses and discloses no withdrawal of the others. Either the record is incomplete or the court was under a misapprehension in that particular, or meant by what was said to rule that the other defenses were not tenable. The statement amounted to an instruction to that effect. Plaintiff's counsel contend that in any event it was the only defense permissible because the only reason given by defendant on refusing payment when proofs of loss were tendered it, citing *Smith* v. *Insurance Co.*, 107 Mich. 270 (30 L. R. A. 368) ; *Jacobs* v. *Insurance Co.*, 183 Mich. 512. That proposition is contingent on a "knowledge of all the circumstances attending the loss" and its application might well be questioned under the evidence as to some of the defenses insisted upon, but the more serious and distinctly paramount

issue here, to which the evidence and efforts of counsel on both sides were chiefly directed, was whether plaintiff's testimony raised an issue of fact for the jury, or made out a *prima facie* case upon the essential allegation in its declaration that the insured's death resulted from an accident independent of all other causes.

Defendant by motion and request at the trial for a directed verdict, motion for a new trial, exceptions, etc., properly preserved for review its assigned errors, particularly emphasizing and urging in the trial court and here that no case was made out by the proofs under the conditions of the policy, that the verdict was without evidential support, was both against the overwhelming weight of evidence and contrary to plaintiff's own evidence.

The policy in question was purely an accident policy, the premium being $5 per thousand per year, with plaintiff as beneficiary in case of accidental death. The material provisions of the policy to which the evidence and contentions of counsel were directed are that defendant—

"Does hereby insure Wm. S. Abbott against bodily injuries, *effected directly and independently of all other causes* through external, violent and accidental means (suicide whether sane or insane, is not covered), as specified in the following schedule: * * *

"If any one of the disabilities enumerated below shall result from such injuries *alone*, within ninety days from the date of accident, the company will pay the sum specified opposite such disability; or, if such injuries shall, independently and exclusively of all other causes, immediately, wholly and continuously disable and prevent the insured from performing any and every kind of duty pertaining to his occupation, and during the period of such continuous disability and within 200 weeks from the date of accident, shall result in any one of the disabilities enumerated below, the company will pay the sum specified opposite such disability, and in addition weekly indemnity as pro-

vided in Part B, to the date of death, dismemberment or loss of sight.

"For loss of life—the principal sum."

Members of deceased's family, friends and acquaintances testified that he was an energetic, hard-working man, apparently in general good health and attentive to his business, which called him from his home much of the time to different parts of the State and necessitated much travel; that he was fond of outdoor exercises and interested in athletics, had regularly attended to his business during the summer previous to his death and up to the time of his last illness, making business trips in July, August, and October, and took no regular vacation that summer except as he visited his family week-ends and over Sunday at Mullet Lake, where they spent the summer, at which times he played tennis, rowed, fished, went in bathing, etc., as was his custom when opportunity presented itself.

It was also shown by plaintiff's own witnesses that for over three years prior to his death deceased was afflicted with cirrhosis, or hardening of the liver, which Dr. Simpson, the only medical witness produced by plaintiff, said was "an old chronic proposition." He had so diagnosed Abbott's condition from objective and subjective symptoms in June, 1916, when attending him professionally for an attack accompanied by severe pains in the region of the gall bladder, at which time his urine was found to contain bile, and the doctor testified the attack was plainly cholangitis, or inflammation of the gall ducts. Of what his subsequent autopsy disclosed in that particular he relates:

"We found the liver small and hard, what in medicine we call cirrhosed liver, which is a hardening of the liver in the region of the gall bladder; that is under the ribs here, next to the liver, of course. The organs were all very much adherent, sticking together, the intestines were sticking to the liver, the gall blad-

der was stuck to the intestines; there was what we call adhesions all over, all those organs, that were old, thick, heavy adhesions, which is perfect evidence of inflammation existing for a long time, months or years probably. I found the gall bladder. It contained two or three gall stones. It was a thick gall bladder, the walls were thickened as though there had been an involvement there at various times, for some time. * * * The other organs were not noteworthy except the spleen, which is situated on the left side of the abdominal cavity, which was larger than normal."

Of the attack in June, 1916, when Dr. Simpson was called, plaintiff testified that her husband had spent the night at home and it came upon him early in the morning before he had arisen, preceded by no accident. Neither was a previous severe attack in March, 1913, which came upon him while at home accompanied by acute pains in the right side of his abdomen, having "a tendency to double him up," on which occasion he was removed to a hospital where he underwent an operation in which it was discovered that he had cirrhosis, or hardening of the liver, and he was cautioned by the surgeon to live a moderate life thereafter.

Dr. Simpson testified that when called to attend deceased in October he found him in bed, slightly jaundiced, with some fever and extreme tenderness in the upper part of the abdomen near the gall bladder. There were some very small bruises on his back near the hips which did not require any professional care and he turned his attention to the features of the case which did. An examination of his urine disclosed that it contained bile. The extreme tenderness in the region of the gall bladder and his fever grew less for some days after he commenced to treat deceased but the jaundiced condition continued, and on November 5th or 6th a developed distention of the abdomen indicated a collection of fluid there requiring relief by tapping, which the doctor performed on two occasions

taking away several quarts of fluid, cloudy with pus cells each time, the same being what is known as ascites, or the white part of the blood caused to ooze out through some membrane by an obstruction in the return flow of blood, the pus cells causing the cloudy appearance indicating infection present somewhere. The jaundice had become more apparent over the skin and in the whites of his eyes, and after the 7th or 8th of November the patient grew rapidly weaker until his death, on the 10th, the cause of which the doctor diagnosed and certified on two occasions as before stated.

Four witnesses of the medical profession were sworn and examined at length as experts touching the cause of death—Dr. Simpson being called by plaintiff and Drs. Kennedy, Meloy and Schmidt by defendant. In general their testimony was in harmony upon the symptoms, nature and effect of hardening of the liver, and related maladies which Dr. Simpson had described as connected with the case, cholecystitis being inflammation of the gall bladder and cholangitis of the gall ducts, resulting from infection, while cirrhosis of the liver is described as a chronic, incurable inflammation of that organ with progressive hardening by which changes take place in its structure causing the tissues to become fibrous and non-elastic with a binding effect gradually making it harder and smaller. Dr. Simpson likened the effect to "squeezing a sponge," having a "tendency, due to the contraction and the crowding, to cut off the supply (of blood) that comes from the portal vein," which he described as a vein about 3 inches long and about 1/6 of an inch in diameter, deep in the abdomen, carrying the blood from the abdominal organs into the liver. Dr. Kennedy, clinical professor of surgery in the Detroit Medical College and a surgeon of wide experience, said of the disease:

"There is no cure known after a person is suffering

an attack of cirrhosis of the liver. It ultimately results in death, and on an average very few persons live longer than three years, very rarely a case will run longer than that. After the disease has once taken hold of the organs, it is progressive and the terminating event is usually ascites and death."

The conflict in the expert testimony was chiefly over Dr. Simpson's theory that death resulted in this instance from a traumatic thrombus, or blood clot in the portal vein, caused by the fall deceased experienced "starting thrombosis" of that organ, of which defendant's three medical witnesses denied the possibility, and the length of time before the cirrhosis and admittedly "infected condition of the bile ducts and gall bladder," which Dr. Simpson stated deceased had "for years," would necessarily terminate fatally.

Dr. Meloy, director of laboratories at Grace Hospital, who in his work with morbid anatomy-disease tissues to determine what ailments existed had performed between 550 and 600 autopsies in investigating the cause of death, was present at the autopsy performed by Dr. Simpson, and similarly described the conditions found. He diagnosed the cause of death as cirrhosis of the liver, and testified that while the fact a person is suffering from that disease is sometimes not discovered until revealed by a *post mortem,* the average length of life for persons found stricken with hardening of the liver is about three years. When asked as to the possibility of a fall having caused thrombus of deceased's portal vein he replied:

"It is my opinion that there was nothing anatomically, either gross or microscopic, which would indicate anything of that nature. * * * At the time of the autopsy there were no conditions found that would indicate he had received injuries as the result of the fall."

So far as relates to any facts disclosed by the autopsy illuminating Dr. Simpson's theory of a throm-

bus their testimony is not inharmonious. On cross-examination Dr. Simpson was asked and answered of the autopsy:

"*Q.* You found the diseased condition of the liver, the cirrhosis of the liver, did you not, as you testified?

"*A.* You mean when I did the *post mortem?*

"*Q.* You were of that opinion prior to the *post mortem?*

"*A.* Yes, I was of that opinion.

"*Q.* You found the cholecystitis and the cholangitis, did you not?

"*A.* Yes.

"*Q.* You had found those conditions and those conditions were due to natural causes, were they not?

"*A.* Yes.

"*Q.* The only thing that you did not find was the thing you suspected, which was a thrombus, didn't you?

"*A.* Yes.

"*Q.* And that was the important thing that you performed the *post mortem* for, that is the only thing that you did not find that you thought might exist?

"*A.* I didn't go at the *post mortem* to prove any conceived theory at all, I was after information as to what was the cause.

"*Q.* You had a preconceived notion that this man died from a thrombus?

"*A.* Yes.

"*Q.* What did you want to perform the autopsy for if it was not to find out if he had a thrombus?

"*A.* To see whether there was any other condition there that causes ascites, namely, any malignant growth, or something of that sort. * * *

"*Q.* Did you find anything?

"*A.* There was no malignancy, no."

His reason given for not ascertaining the condition of the portal vein was that he could not find it owing to the various organs in the region of the gall bladder being bound together by "dense, old adhesions," and the body had then been embalmed. Dr. Meloy, who saw the conditions, and the other physicians who

heard them described, testified that, while perhaps more difficult for those reasons, the portal vein could have been found, dissected out and examined for a traumatic injury with certainty as to whether or not there was a thrombus. Be that as it may, the portal vein was not examined and no thrombus was found as a result of the autopsy. Failing to find by his autopsy any thrombus or injury to the portal vein Dr. Simpson developed his theory as to the cause of death by inference on inference. Inferring there was a thrombus, though stating he was "willing to admit I cannot prove it," he inferred from the fall and illness of his patient that there was an injury to the portal vein causing the inferred thrombus, which he inferred obstructed the supply of blood to the diseased liver causing ascites and death, admitting on cross-examination that a common, and ultimately inevitable, cause of obstruction of the portal vein is cirrhosis of the liver, with which deceased had been afflicted for over three years, and adhesions such as he found in the region of or around the portal vein. Of his experience and professional knowledge upon the subject he was asked and answered in part as follows:

"Well, did you ever see or hear or read of a case where a thrombus was caused as the result of a personal injury to the portal vein, if so where?

"A. I don't know as I can cite any injury right now. No. * * *

"Q. Do you know of any authority or medical work who will cite a case of thrombus of the portal vein that is due to an accident?

"A. I have not looked up the authorities at all."

But passing defendant's expert testimony and contention that the great weight of evidence was against the verdict upon that issue, plaintiff's only expert witness, Dr. Simpson, admitted in connection with his theory of a thrombus that the portal vein, which lies deep in the abdomen, is "practically never injured ex-

cept indirectly," and "it was not probable that a man in perfect health would have a thrombus of the portal vein resulting from a fall," assigned a different cause of death in his certificate to the vital statistics division of the State department, and finally in his cross-examination touching the sum of his conclusions as to the cause of death testified as follows:

"*Q.* Well, doctor, you have apparently come to the conclusion, and are of the opinion, that deceased met his death as the result of a combination of causes?

"*A.* Yes.

"*Q.* That it was partially due to a diseased condition of the liver, or cholecystitis, or cholangitis, together with the fall which may have produced thrombus, is that true?

"*A.* Yes. * * * So I cannot say, as I said a moment ago,—I would not say any one of them independently was the cause of death.

"*Q.* But it was due to a combination of all the conditions which existed?

"*A.* Yes."

Accepting this as true we have by plaintiff's proofs a case where a progressive, incurable ailment, liable at any time to terminate fatally by its own development cutting off its supply of blood from the portal vein, acting together with the accident, in causal connection, caused the death which was, as sometimes expressed, produced "by the sum of the two causes."

Under the conditions of this limited casualty insurance the burden of proof was upon plaintiff to show that the accidental loss of life charged resulted directly from external, violent and accidental means, independently of all other causes. *Rathman* v. *Casualty Co.,* 186 Mich. 115 (L. R. A. 1915E, 980, Ann. Cas. 1917C, 459) ; *National Masonic Accident Ass'n* v. *Shryock,* 20 C. C. A. 3, 73 Fed. 774. In the last case cited Judge Sanborn summed up the proposition involved in conditional accident policies of this nature, where the claim is for accidental loss of life, and stated

what is by weight of authority recognized as, in substance, the established general rule, in part, as follows:

"The burden of proof was upon the defendant in error to establish the facts that William B. Shryock sustained an accident, and that the accident was the sole cause of his death, independently of all other causes. If Shryock suffered such an accident, and his death was caused by that alone, the association agreed by this certificate to pay the promised indemnity. But if he was affected with a disease or bodily infirmity which caused his death, the association was not liable under this certificate, whether he also suffered an accident or not. If he sustained an accident, but at the time it occurred he was suffering from a pre-existing disease or bodily infirmity, and if the accident would not have caused his death if he had not been affected with the disease or infirmity, but he died because the accident aggravated the effects of the disease, or the disease aggravated the effects of the accident, the express contract was that the association should not be liable for the amount of this insurance. The death in such a case would not be the result of the accident alone, but it would be caused partly by the disease and partly by the accident, and the contract exempted the association from liability therefor. These propositions have been so lately discussed and affirmed by this court that we content ourselves with their statement."

Citing numerous cases, to which may be added *Commercial Travelers Mutual Accident Ass'n* v. *Fulton*, 24 C. C. A. 654, 79 Fed. 423; *Hubbard* v. *Accident Ass'n*, 98 Fed. 930; *Hubbard* v. *Insurance Co.*, 98 Fed. 932; *National Ass'n of Railway Postal Clerks* v. *Scott*, 83 C. C. A. 652, 155 Fed. 92; *Stanton* v. *Insurance Co.*, 83 Conn. 708 (78 Atl. 317, 34 L. R. A. [N. S.] 445); *Illinois Commercial Men's Ass'n* v. *Parks*, 103 C. C. A. 286, 179 Fed. 794; *Maryland Casualty Co.* v. *Morrow*, 130 C. C. A. 179, 213 Fed. 599 (52 L. R. A. [N. S.] 1213); *Ætna Life Ins. Co.* v. *Bethel*, 140 Ky. 609 (131 S. W. 523); *Penn* v. *Insurance Co.*, 160 N. C. 399 (76 S. E. 262, 42 L. R. A. [N. S.] 597); *White*

v. *Insurance Co.*, 95 Minn. 77 (103 N. W. 735, 884, 5 Ann. Cas. 83) ; *Stokely* v. *Casualty Co.*, 193 Ala. 90 (69 South. 64, L. R. A. 1915E, 955) ; *Ward* v. *Insurance Co.*, 85 Neb. 471 (123 N. W. 456).

Plaintiff's counsel contend that the case was properly submitted to the jury under the rule and upon the issue of proximate cause, urging that the provisions of the policy should be construed as meaning that where the death results within 90 days of an accidental injury without which the insured would not have died within the 90 days, even though a contributing ailment without which the accident would not have caused death was involved, the death should be deemed to "result from such injuries alone" within the meaning of the policy, into which such language reads the principle of proximate cause.

This is an action *ex contractu.* Negligence is not an element of the contract of insurance. In tort cases not arising out of contractual relations of the parties the doctrine of proximate cause as applied to the claimed injury for which damages are sought is invokable by both defendant and plaintiff when different contributing causes are claimed on their respective theories as to the paramount, efficient and major or proximate cause, to be determined between two or more causes under the rule of selection applicable in negligence cases. Here the contract of insurance limits the inquiry to a single accidental cause from which alone it must be affirmatively shown that death resulted independently and exclusively of all other causes.

Deceased was a man of long and large experience in the insurance business, necessarily familiar as an adjuster with the general phraseology of policies and their interpretation. He was qualified to contract and better equipped to understand the contract of insurance under consideration than the average business

man. He traveled much in his business. His policy was sufficient to cover the customarily anticipated hazards of accidents while traveling. It was purely accident insurance and cheap compared with regular life insurance as to which he was not an insurable risk. It covered accident which resulted in disabling injury or death of a person afflicted with disease or bodily infirmities which had no causal connection with the accidental death or injury; it covered accidents which caused a nonpre-existing disease which resulted in disability or death, but it plainly excepted accidents to persons afflicted with a pre-existing disease which, co-operating with the accidental injury, caused disability or death, as a result of the two causes in combination.

Courts cannot recast such contracts for the parties into what might seem a more discreet or fair agreement, but must decide the controversy by the plain terms of the written contract the parties saw fit to make. We find no ambiguity or uncertainty in the explicit provisions of this policy permitting two constructions. If disease was an efficient, co-existing, contributing cause of death, it would be a palpable contradiction of the plain, ordinary meaning of the language used to say death resulted from the accident alone, directly and independently of all other causes. In *Binder* v. *Accident Ass'n*, 127 Iowa, 25 (102 N. W. 190), while the rule of construction most favorable to the assured is declared and fully recognized, it is said that nevertheless plain, explicit language cannot be disregarded. Passing upon a policy providing that the death or disability insured against must be "purely accidental and the direct result of an accident, and that the accident was the sole and only cause of the said member's death," the court said:

"If it be true, as the jury might have found under the evidence, that the diseased condition of the arteries

aggravated the effect of the accident, if there was one, and contributed to the disability occasioned thereby, then, under the express terms of the contract there was no liability on the part of the association."

The 90-day limitation in the policy is made of general application to "any one" of the enumerated disabilities resulting within that time after the accident from the injuries which it alone causes. In *Ætna Life Ins. Co.* v. *Bethel, supra,* following the general clause limiting liability to bodily injuries effected by accidental means "independently of all other causes," the specifications or enumeration of injuries covered by the policy provides, "If death results solely from such injuries within 90 days the said company will pay the principal sum of five thousand dollars" to the named beneficiary, and it was there held "indispensable to recovery that the evidence should show that the fall 'independently of all other causes' produced the death of Dr. Bethel."

In *White* v. *Insurance Co., supra,* where a judgment on verdict for plaintiff was reversed because it conclusively appeared the deceased's death was due in part to diabetes, the injury aggravating the diabetic condition and inducing a "diabetic coma," the court, although using the term in discussion of the authorities, said:

"The rule of proximate cause, as applied to actions of negligence, cannot be applied in its full scope to contracts of this nature. 1 Cyc. p. 273."

It is conceded in this class of insurance that if the accidental injury independently and directly produces a fatal, nonpre-existent malady which operates as a resulting agency, the accidental injury as sole initial factor must alone be held the sole lethal cause, which is sometimes referred to in decisions and text books as the proximate, primary or immediate cause. Such

adjectives in their popular sense are convenient to emphasize that there is no other legal cause.

"The rules of proximate and remote causes, as understood in the law of negligence, cannot be justly or safely applied under a contractual stipulation that the injury or death must have 'resulted from the accident independently of all other causes,' and when an issue of fact is presented whether the person was suffering from a disease which had causal connection with the injury or death. * * * A discussion of proximate and remote causes can be pertinent only when it appears that there have been two or more causes and when a judicial selection must be made as between the different causes, and a choice made of one as the proximate cause," etc. *Penn* v. *Insurance Co., supra.*

It is urged for plaintiff that this case is squarely within and controlled by *Skinner* v. *Accident Ass'n,* 190 Mich. 353, wherein a judgment on verdict was sustained on the issue of whether death following an accident resulted independently from injuries caused by the accident, or was contributed to, or caused by, a pre-existing disease. As stated by the trial court plaintiff's claim and theory were that deceased died "of an ulcer or abscess following and caused by the injury which he received at the time he fell," while defendant's theory was that "death was due to a combination of difficulties set up by a cancer and prostatic abscess which resulted in pus absorption and terminal broncho-pneumonia." An autopsy was held and testimony introduced by the respective sides tending to support their conflicting claims. The existence of a cancer was denied by plaintiff but, if proven, plaintiff's counsel conceded "that unless the cancer was the result of the accident and the cancer caused the death, that we are not entitled to recover." The trial court submitted those issues of fact so raised to the jury under a fair charge which cannot be claimed to have left for their determination the technical issue of

proximate cause applicable to actions of tort. By direct application of the recognized rule of law to the case the court said:

"If you find from the testimony that whatever abscess there was that caused death was the direct result of the accident, why, unquestionably in that case plaintiff would be entitled to recover, if that was the sole cause; but if the cancer which is claimed by defendant to have existed prior to that time contributed to his death unquestionably, gentlemen, you must find a verdict for defendant, because then it would not be the sole cause, and any blow he received would not be the sole cause, and he can only recover where the accident was the sole cause."

Illustrative of the somewhat non-technical, popular sense in which "proximate cause" is sometimes used where the question of sole cause is the controlling issue, this case is cited in 2 Bacon on Life & Acc. Ins. (4th Ed.), § 522, in support of the text that "the fact that the accident precedes a disease causing death, or that the insured was afflicted with some disease not the proximate cause of death, is no defense," and *Jiroch* v. *Insurance Co.*, 145 Mich. 375, is also cited to the proposition that "what is the proximate cause is as a rule a question for the jury." In the *Jiroch Case* the issue was a question of sole cause. The trial court squarely charged the jury that if the amputation of plaintiff's foot was made necessary because the accident which he claimed to have suffered aggravated the effects of a pre-existing disease (diabetes), or the disease aggravated the effects of the accident, "then, in such case, the amputation would not be the result of the accident alone," and plaintiff could not recover. This court said in sustaining the charge and judgment that the evidence was ample to support the finding of the jury "that the disease which developed subsequent to the accident was attributable to it."

Upon this record plaintiff's evidence as applied to

the conditions of the policy in question fails to sustain the burden of proof upon the essential allegation that the insured's death resulted from accidental bodily injuries alone and was effected directly and independently of all other causes through external, violent and accidental means. The judgment should therefore be reversed, with costs to defendant, and a retrial granted.

BROOKE, STONE, and CLARK, JJ., concurred with STEERE, J.

BIRD, J. The conclusion reached by Mr. Justice STEERE that no issue was presented for the jury in this case is at variance with my opinion. If we exclude the medical testimony and consider only the lay testimony, I think a *prima facie* case was made for the jury. It appears from the record that Mr. Abbott, the insured, was 51 years of age, that he weighed 210 pounds, was in robust health, and had been for several years an unusually active business man. The only sickness which the record shows he had suffered in several years was in 1913, when he was ill for a period of three weeks with an ailment of the liver, and again in 1906, when he was incapacitated for one day. His business was that of State agent for a fire insurance company, and he traveled over the State looking after the company's interest. He was not only attentive to his business but appears to have been a great lover of sports and athletics. The testimony shows that during the last years of his life, when opportunity offered, he fished, rowed boats, played tennis, golf and baseball, waded in trout streams, and on one occasion ran in a fat man's race at some festivity. These activities in business and pleasure continued right up to the time he met with the accident. When he arrived home on the evening of his injury, he appeared well and happy, as usual. He went upstairs

to prepare for dinner. When called, he started down, and by a misstep, fell on the floor of the landing. When found, his back was against a riser and his head against the wall. When offered assistance by members of the family he complained of his back and begged them to leave him alone. He soon recovered sufficiently to go down to dinner. After dinner he smoked a cigar and read his newspaper, but retired earlier than usual after taking a hot bath. At midnight his wife applied hot cloths to relieve his back and neck. The following day he was confined to his bed, sleeping much of the time. The next day he was sore and stiff, but he dressed and went out. He was home by one o'clock in the afternoon and in bed and did not go out again. As the days passed he grew worse, his complexion became jaundiced, and at the last he was badly bloated. On November 10th he died after having been ill 17 days. There is no dispute about his injury, no dispute about the marks on his body as a result of the fall. When these facts were shown supplemented by his contract with defendant, I am of the opinion that a _prima facie_ case was made without taking into account the medical testimony. _Semmons v. Benefit Ass'n,_ 180 Iowa, 666 (163 N. W. 338). The proof in the present case is much clearer than in the one cited because in the case cited there was some question as to the manner in which the accident happened.

But plaintiff is not obliged to rely on this alone. She went further and showed by Dr. Simpson, the physician who attended him in his last sickness, that, in his opinion, he died from an obstruction in the portal vein. He testified:

"My opinion is that he died from an obstruction of the portal vein, which is a large vein through which all the blood from the intestines and stomach and liver —spleen, I should say, goes directly into the liver. I

think that was primarily the obstruction of that vein that caused his death."

And he further testified that, in his judgment, the injury was what caused that condition. The other physicians at the *post mortem* agreed with him that death was caused by a thrombus in the portal vein, but two of the doctors disagreed with him as to the thrombus being caused by the injury. Dr. Meloy, however, agreed with Dr. Simpson that that condition could be produced by an injury.

Had the testimony stopped here there certainly could have been no question but what a *prima facie* case had been made for the jury. If we are right about this, Can that *prima facie* case be destroyed because Dr. Simpson made some statements inconsistent with portions of his direct testimony? It is not the province of the court to determine what statements shall be accepted as the truth and what shall be rejected; that duty, as we have repeatedly held, rests with the jury. *Kelly* v. *Freedman,* 56 Mich. 321; *Watson* v. *Watson,* 58 Mich. 507; *People* v. *Hansen,* 183 Mich. 565; *Parnell* v. *Pungs,* 190 Mich. 638; *Burtch* v. *Child-Hulswit & Co.,* 207 Mich. 205.

It is said that Mr. Abbott had cirrhosis of the liver, and that this caused or contributed to his death. If it be conceded that he did have cirrhosis of the liver, under the testimony, it does not necessarily follow that he was near his end, or that his malady was fatal. Dr. Kennedy, one of the medical experts, testified that:

"It is true that a man might have cirrhosis of the liver and live ten years, if he had established a good collateral circulation it would have a tendency to relieve ascites, but would not by any means eliminate the poison of the liver which the liver secretes, and as far as death from ascites is concerned, it would tend to lengthen his life. Ascites is a result of cirrhosis of the liver."

Dr. Carl Meloy, one of the medical experts, agreed with this and said that:

"With the well established collateral circulation a man might die from an entirely different cause at a much later period."

Dr. Harry B. Schmidt, also one of the experts, testified that:

."After a man establishes a good collateral circulation he can live indefinitely with it."

And Dr. Simpson testified that, in his opinion, the patient did not die from cirrhosis of the liver, and it is further shown by the testimony that Mr. Abbott had few, if any, symptoms of a cirrhosed liver.

But it is said that because Dr. Simpson testified, on cross-examination, that death may have resulted partially from a diseased liver and partially from the fall, that under the rules applied by the courts in the construction of policies similar in wording, no recovery can be had.

In construing a similar provision as applied to a similar state of facts it was said in *Continental Casualty Co.* v. *Lloyd,* 165 Ind. 52 (72 N. E. 824), that:

"When two or more causes contribute to an injury, where there is doubt, or the facts of a character that equally prudent persons would draw different conclusions therefrom, in such cases, which of the contributing causes is the efficient, dominant, proximate cause, is a question to be submitted to the jury."

In that case the insured received a shock from a fall producing a cerebral hemorrhage. A tumor was found, which the doctor testified would take from six months to two years to form. The court in its further comment said:

"The tumor had impaired the resisting strength of the artery, *but had not effected immediate danger to life. It was proper under the evidence for the jury*

*to view the impairment as a condition, and not as a cause, and to find that the fall was the originating, efficient, direct and proximate cause of death;* that is, that the fall set in motion a force that progressed upon present existing conditions in natural, usual sequence to effect the fatal result. Twelve bricks are set in a row, eight inches apart. By accident, the first is toppled and falls against number two, which in turn falls against and throws number three, and so on until the number twelve is cast down by number eleven, and inflicts injury. With a proper footing, number twelve might, or might not, have fallen. In such case could it be said that because brick number twelve had a weak and imperfect footing, such imperfection was the direct, dominant, proximate cause of the injury? Who knows that the artery would not have been ruptured by the fall if it had been in a normal condition? Or who can tell that the insured would not have died from some other cause if the fall had not animated and accelerated the energy of the tumor. In fact, Dr. Ohlmacher testified that the autopsy disclosed in the vital organs of the deceased, in addition to the tumor, 'some affection of the mitral valve of the heart, some consequent enlargement of the heart, and beginning broncho-pneumonia, a beginning of acute Bright's disease, and a moderate fatty change in the liver.'

"From these considerations, it seems clear that the jury in its search for the proximate cause of death, had the right to include that even though the fall would not have produced death but for the impaired artery, the tumor at most was a remote, and not a proximate, efficient cause. *Fetter* v. *Casualty Co.*, 174 Mo. 256 (73 S. W. 592, 61 L. R. A. 459, 97 Am. St. Rep. 560), and *Freeman* v. *Accident Ass'n*, 156 Mass. 351 (30 N. E. 1013, 17 L. R. A. 753), are recent and very similar cases."

In *Hall* v. *Assurance Corp.*, 16 Ga. App. 66 (85 S. E. 600), the insured was a heavy man having a chronic affection of the kidneys. He slipped and fell while stepping down from the curb, resulting in an injury. He lived only a week. The doctor testified that he might have lived two years but for the accident. In

discussing the same question that is before us the court said in part:

"We think the supreme court of Georgia, in accordance with the general proposition stated above, has decided the principle controlling this case, and has announced the doctrine, not only that the disease from which the insured suffered, *must have been a substantially contributing cause to the injury, but that liability is not defeated merely because the existing disease aggravated or rendered* more serious the consequences of the accident.   \*   \*   \*

"And so in the present case, we think that it should have been left to the jury to determine whether the death of Judge Hall was caused by the fall, although accelerated by the incurable disease from which he suffered, or whether the disease was a contributing cause of the injury from which his death resulted. *We think that when the plaintiff shows a bodily injury, which, prima facie, was inflicted through external, violent and accidental means, the insurer,* in order to rebut a *prima facie* right of recovery and to defeat liability *must show* (and of course he may do this by testimony which comes from the plaintiff's witnesses) that the injury in question was due in the first instance, either wholly or in part, to the disease from which the insured appears to have suffered. In other words, where as in the present case, it appears that the assured was bruised and wounded by a fall, which was apparently accidental, it is to be presumed, until the contrary appears from the testimony (whether for the plaintiff or defendant of course being immaterial), that the fall was the prime cause of the final result. *If there is evidence that the result was caused by an intervening cause, or that such a cause contributed to the result, it is then for a jury to say whether or not the presumption raised by proof of an injury due to a cause prima facie accidental has been rebutted. Citizens' Bank of Tifton* v. *Timmons,* 15 Ga. App. 815 (84 S. E. 232). *The ascertainment of the proximate cause of death is the real object to be attained in every such case as that now before us.* Lawyers, judges and psychologists have groped for centuries and settled on nothing more definite than proximate cause. *To say absolutely that a death resulted solely and ex-*

*clusively from an injury is to say that it would not have resulted without the injury, and this can never be said except as a matter of mere probability."*

The same holding and substantially the same reasoning will be found in the following cases: *Bohaker* v. *Insurance Co.*, 215 Mass. 32 (102 N. E. 342, 46 L. R. A. [N. S.] 543) ; *Railway Mail Ass'n* v. *Harrington*, 136 C. C. A. 230, 220 Fed. 622; *Fetter* v. *Casualty Co.*, 174 Mo. 256 (73 S. W. 592, 61 L. R. A. 459, 97 Am. St. Rep. 560) ; *Moon* v. *Commercial Travelers*, 96 Neb. 65 (146 N. W. 1037, 52 L. R. A. [N. S.] 1203, Ann. Cas. 1916B, 222) ; *Lickleider* v. *Traveling Men's Ass'n* (Iowa), 166 N. W. 363; *Collins* v. *Casualty Co.*, 224 Mass. 327 (112 N. E. 634) ; *Fidelity & Casualty Co.* v. *Meyer*, 106 Ark. 91 (152 S. W. 995, 44 L. R. A. [N. S.] 493).

Applying the construction of these cases, if the question were in doubt as to which of the contributory causes spoken of by Dr. Simpson in his cross-examination was the efficient, dominant, proximate cause, it was a question to be submitted to the jury. This construction would make the policy actually mean more nearly what the purchasers of such policies think they mean when they purchase them. But to say that no recovery can be had under these insuring clauses in any case where a pre-existing disease may have contributed in some slight degree to the result is to make the contract of very little value to the insured.

I am of the opinion that the case was properly submitted to the jury and that the verdict should be affirmed.

MOORE, C. J., and FELLOWS and SHARPE, JJ., concurred with BIRD, J.