COMMERCIAL CASUALTY INS. CO. v.
STINSON.
No. 8420.

Circuit Court of Appeals, Sixth Circuit.
April 10, 1940.

HICKS, Circuit Judge, dissenting.

Robert E. Plunkett, of Detroit, Mich. (Frederick J. Ward, of Detroit, Mich., on the brief), for appellant.

Guy Bratton, of Detroit, Mich. (Bratton & Bratton, of Detroit, Mich., on the brief), for appellee.

Before HICKS, ALLEN, and HAMILTON, Circuit Judges.

HAMILTON, Circuit Judge.

This is an appeal from the verdict of a jury in an action instituted by appellee, Marjorie W. Stinson, on an accident insurance policy in the principal sum of $10,000, issued by appellant, Commercial Casualty Insurance Company, on the life of her husband, Clayton B. Stinson, who died December 25, 1936.

The risk insured against was "loss resulting directly and independently of all other causes, from accidental bodily injury fatally or non-fatally." Two issues are presented, (1) whether the appellee carried the burden of proof by a fair preponderance of the evidence that the death of the insured resulted directly and independently of all other causes, from accidental bodily injury; (2) whether appellee filed affirmative proofs of loss within ninety days after the alleged injuries to the insured.

In considering appellant's first assignment of error, it must be remembered that the evidence should be construed most favorably to the appellee. To this end she is entitled to the full effect of every legitimate inference therefrom and if, upon the evidence so considered, reasonable men might differ, appellant must fail. If, on the other hand, no reasonable man could reach a verdict in favor of appellee, appellant's error is well taken. A mere scintilla of evidence, however, is insufficient to sustain a verdict in her favor. It must be of substantial and relative consequence, not vague, uncertain or irrevelant, and must carry the quality of proof to induce conviction and make an impression on reason.

Appellant issued its policy on May 31, 1935, at which time the insured was forty-six years of age and engaged in the business of traveling for a manufacturer, selling hardware to jobbers. On the afternoon of December 24, 1936, he attended a Christmas party at a restaurant with twelve or fifteen of his business associates, which was a customary affair and lasted until approximately 4:30 o'clock and while there took two drinks of intoxicating liquor. After leaving the party, he returned to his employer's office, after which he and another friend made three visits for the purpose of wishing the season's greetings to mutual friends at their homes, where no drinks were served. He returned home around 7 o'clock, ate dinner, and after about an hour, without his coat, called on his next door neighbor, who returned home

with him and remained for a few minutes, after which he called on another neighbor who also returned home with him and visited briefly. While his wife, the appellee, was making coffee for him, he left to call on a third neighbor and as she stepped to the front door to call him she observed him ringing the door bell of this home which was three doors, or about eighty feet, from her home and, no one answering, he turned to leave and she saw him slip as though his feet flew out from under him and after getting her coat she ran to him and found him on his hands and knees endeavoring to pick himself up a few feet distant from the front door where he had seemingly crawled after slipping. There were four cement steps of normal height at the front door and a cement sidewalk, on all of which was a thin coat of ice, the weather being cold. She stated she put her arms under him and helped him up and back to their front porch but he resisted going in, broke away from her, stumbled against the curb and fell against a tree and lay there still and that she could not pick him up. After a few minutes he got up with her help and stumbled across the street and rang the bell at the home of a neighbor, named Betzold, who was a stranger to them, and as the door was opened, the insured crumpled up and fell against it and she asked Betzold to help her get him home and the two of them half-dragged and half-carried him protestingly to his home. After trying to get him to lie down on the davenport on the first floor, which effort he resisted, got him upstairs to his room about 9:30 o'clock at which time he was delirious and talking about going to Flint and Saginaw on some business. She asked Betzold to call a doctor for her which he did and later Dr. Charles T. Lewis, whom she did not know, came, at which time she and her two daughters were having difficulty restraining the insured from again leaving the house.

Dr. Lewis, on his arrival, did not take insured's temperature or pulse, nor make a physical examination of him but after struggling and wrestling with him considerably, gave him three hypodermics of morphine over a period of two and one-half hours, after which he seemingly went into a coma. Between 11 and 11:30, the doctor called Ford Hospital, where insured was taken in an ambulance and where he died the following morning around 7 o'clock.

All of the friends and neighbors who were with or saw insured on the afternoon and evening of December 24th, testified he was not drunk, that he was jovial, friendly, reciting poetry and in a happy mood, with the exception of the Betzolds who saw him for the first time when he rang their doorbell that night and fell into their front door. They testified he was drunk, dirty, disheveled and limp and that they wanted to call the police but that the appellee requested them not to do so because he was drunk. This, she denies. Betzold testified that while he was assisting appellee to get the insured home, he fell down several times and was in a belligerent mood and that he remained and worked with him about an hour and a half to get him on the bed and then called the doctor.

Dr. Lewis testified he did not know the insured until he was called to attend him at which time he was struggling to get up and that he worked and wrestled with him and when he finally tired he gave him a hypodermic, which did not calm him but seemed to make him wilder and after about an hour, he gave him another and later another and at 11:30 o'clock "he apparently weakened or tired and he was less resistful and he kind of laid there * * * and we thought he was tiring, and finally, this being Christmas Eve, and I had several things to do, apart from making this one social call, I had to get out of there. * * * I couldn't stay there all night"— and he left after calling the Ford Hospital. He said he did not tell any one at the house that night that the insured was drunk, nor make any physical examination of him; just endeavored to subdue him and gave him the three hypodermics. He refused to sign the affidavit as attending physician as to the cause of death. However, he testified his death was caused from acute alcoholism.

An autopsy was made on insured's body on the morning of his death which showed the cause of death to be "circulatory collapse and cerebral oedema." The doctor who made the autopsy found a small hermatoma or inward hemorrhage in the left temple and some bruises on the left wrist. He also found fluid in the brain substance under the meninges or what he called a "wet brain" which he thought was due to alcohol and light patches on the large blood vessel or aorta. He stated that in his opinion the cause of death was circulatory collapse due to cerebral oedema

or a lack of oxygen in the tissues. He testified he thought the insured died of acute alcoholism. He said the combination of morphine with alcohol contributed to insured's death and that in his opinion it was contrary to good practice to give hypodermics of morphine when treating a patient for alcoholism.

A physician at Ford Hospital, who did not examine the insured, testified his death was caused by a cerebral oedema, which means swelling of the tissues in the brain which disturbs the proper function of oxidation, or a lack of sufficient oxygen. He said insured had a sluggish circulation, decidedly low blood pressure and poor respiration. The only reference to alcohol was that the receiving physician at the hospital reported the odor of alcohol on his breath.

Dr. Owen, who performed a post mortem on insured's body on December 31st, six days after death and after the body had been embalmed and an autopsy held, testified there were a number of contusions over various parts of the body, one over the left temporal region of the head, one on the right hand, on both arms and both elbows. He said he had a number of venous puncture wounds and hypodermic puncture wounds on the hands and arms. He found a number of small hemorrhages through the substance of the brain tissue and also some hemorrhages within the inner covering of the brain or the meninges. He also found hemorrhages throughout the extent of the spinal cord. He said, in his opinion, insured died from an injury to his brain and spinal cord, which he based on the history of the case, many small hemorrhages, throughout the substance of the brain tissue and the spinal cord, and the contusions on his head and other parts of his body. He said that neither alcohol nor alcohol with morphine could have produced the insured's condition.

Two other physicians who did not see the body but who examined the brain and tissues and examined slides made by Dr. Owens, testified the circulatory collapse could have been due to alcohol alone or to alcohol plus morphine. One of these doctors testified that in his opinion the fall was not sufficient to produce death because there was no evidence of a rupture of the membranes of the brain, the meninges or a leakage of the blood from the brain into the spinal fluid.

Dr. Thomas J. Heldt, head of the Neuro-Psychiatry Division of the Ford Hospital, who was consulted over the telephone about the condition of the insured when brought to the hospital, basing his opinion on this information, the hospital record and the history of the case and also on the autopsy record, testified he believed that insured had not experienced a blow or fall or any violent trauma to his head to the extent that could produce his state of unconsciousness at the time admitted to the hospital. Dr. Collins, who received the patient into the hospital and treated him, did not testify.

It is a matter of general knowledge that alcohol is one of the commonest exogenous toxins productive of disorder of the nervous system, and gives rise to an inability to control bodily movements. Large doses may cause death instantaneously by a reflex action on the heart or by cardiac and respiratory depression after the drug has been absorbed. It is equally a matter of common knowledge that the skull possesses a considerable degree of elasticity and may be deformed for an instant by a blow without a fracture and as a result thereof very serious damage may be inflicted on the brain. Concussions may result from a fall, characterized sometimes by unconsciousness and associated with shocks of varying degrees from a momentary stunning as when a boxer is knocked out in the ring to profound unconsciousness lasting hours or days. The blow may be severe enough without external evidence of injury to the skull to produce oedema of the brain, resulting in minute hemorrhages dotted throughout or to local effusion of blood causing cerebral compression which may result in death. It will be seen from applying common knowledge to the facts in the present case that insured's death may have been caused by striking his head at the times he fell or from the excessive use of alcohol, although the only positive evidence in the case of the consumption of alcohol is two drinks in the afternoon. His inability to control his bodily movements and his mental frenzy and hallucinations came upon him after he had sustained the falls.

The contentions of appellant may be summed up as follows: (1) that the fact of an accidental fall or falls at all is not supported by substantial evidence; (2) that if there is substantial evidence showing the fall or falls there is no substantial evi-

dence that the insured by reason thereof suffered injuries which directly and independently of all other causes produced death.

The present contract of insurance covers loss "resulting directly and independently of all other causes" from accidental bodily injury, with an exclusion of "any accidental bodily injury caused or contributed to directly or indirectly by sickness or disease * * * loss resulting from any means or act which if used, done or self-inflicted by the insured while in the possession of all mental faculties. * * *"

■ The only witness who testified to the falls was the appellee, wife of the insured. She stated she saw him turn from a neighbor's door and slip on the porch and go over fast. When she got to him, he was on his hands and knees trying to pick himself up and when she helped him up he put both hands on his head and in the second fall she stated he broke away from her, stumbled across the street and across the curb and fell against a tree and lay there a long time perfectly still. The testimony of this witness is uncontradicted and may not be arbitrarily disregarded or rejected. Its weight and credibility was for the jury.

As to whether the injuries were the cause of death, directly and independently of all other causes, must be determined from the conflicting testimony of the physicians, none of whom saw him before his death, except Dr. Lewis, who made no physical examination of him, but who expressed the opinion that death ensued from acute alcoholism.

The opinions of the others were deduced from an examination of the condition of the body ascertained from the autopsy and the post mortem. All of them testified that hemorrhages occurring before death were disclosed in the brain tissues. One found no leakage of blood from the brain to the spinal column. Dr. Owens testified from a post mortem that he found blood hemorrhages in the spinal cord. Dr. Ryan and Dr. Hartman testified that the blood which Dr. Owens found in the meninges of the spinal cord could have gotten there by reason of Dr. Ryan opening up the brain at the autopsy the day after the death of insured. All of the physicians agree that blood in the meninges of the spinal cord, if found immediately following death, could have been caused by a trauma to the brain and Dr. Owens testified that the minute hemorrhages found in the brain could have been produced by alcohol, but in his opinion the ones he found there were too extensive to have resulted from the use of any drug and were from head injuries.

■ It must be remembered that the policy in question is couched in language chosen by the insurer and the rule applies that construction of the instrument must be that most favorable to the insured deduced from its language and the court should give such construction, if possible to do so under the language used, as will make the policy of substantial value to the holder and carry out the expressed intention of incurring liability where death is from accidental injury. The policy in question would be of little value to the insured if its language be literally interpreted as appellant insists.

■ The principal question in the case is what kind of cause is deemed the proximate cause of death within the meaning of the policy. When different forces and conditions concur in producing a result, it is sometimes difficult to determine which is properly to be considered the cause and in dealing with such cases, the direct, and not remote, cause is considered. However, this does not mean that the cause or condition nearest in time or space to the result is necessarily to be deemed the proximate one. It means that the law will go no further back in the line of causation than to find the active, efficient, procuring cause of which the event under consideration is a natural and probable consequence in view of the existing circumstances and conditions. An injury which might naturally produce death in a person in a certain physical or mental state of health is the cause of his death if he dies because of it, even if he would not have died if his physical and mental condition had been different. The question as to whether the excessive use of alcohol is to be deemed the proximate cause of insured's death within the meaning of the policy so as to prevent a recovery depends upon whether it was the direct cause of his death. However, if owing to the weakened condition of the brain membranes from the excessive use of alcohol, the fall accentuated the brain hemorrhages to the extent of circulatory collapse causing death, the appellant would be liable under contract although, if the insured had been normal, the fall would not have caused such a result. Kansas v. New York Life Insurance Company, 223 Mich. 238, 193 N.W. 867. Compare Abbott

v. Travelers' Insurance Company, 208 Mich. 654, 176 N.W. 473; Wheeler v. Title Guaranty Co., 265 Mich. 296, 251 N.W. 408.

The claim of the appellant that insured's death was caused from the excessive use of alcohol and the contradictory claim of the appellee that it was caused from a fall is each supported by competent evidence and even though the weight of the evidence shows that both causes concurred it was for the jury to say which was the efficient dominant proximate cause.

The present policy provides that the insurer upon notice would furnish to the beneficiary forms for filing proofs of loss and, if they were not furnished within fifteen days after receipt of notice, the beneficiary would be deemed to have complied with the policy requirements by submitting within the time fixed in the policy for so filing written proof covering the occurrence, character and extent of the loss for which claim was made. It also provided that affirmative proof of loss must be furnished to the insurer at its office within ninety days after the date thereof. Appellant insists that appellee failed to comply with these provisions of the policy and by reason thereof her petition should be dismissed.

Appellee notified appellant of insured's death a few days after its occurrence and on January 18, 1937, at its request, she, in writing, authorized police officials and officers, physicians, hospitals and medical examiners or any other person who may have viewed or treated the insured or examined his body, or who had any record or knowledge of him, on request to furnish to appellant's representative any such information. On January 28, 1937, appellant furnished appellee's counsel forms for proof of loss which were returned in blank at its request. On February 24, 1937, blanks were again requested of appellant which it furnished on March 5, 1937, and before the expiration of the ninety days, she returned these forms to the insurer and on June 2, 1937, it rejected them as insufficient, principally because the attending surgeon's affidavit was unsigned, and because the proofs as a whole did not show that insured's death was due exclusively to accidental bodily injuries. Additional information was furnished the insurer and on July 15, 1937, it rejected the proofs of loss for the reason that the attending physician did not certify the cause of death and

that the proofs as a whole did not show loss under the risk covered by the policy and for the further reason that proper proofs had not been filed within the time limit prescribed by the policy.

The requirement that proofs of loss shall be furnished is a condition that becomes operative only after the capital fact of a loss and is to be liberally construed in favor of the insured.

The insurer may demand that the fact of death due to accidental causes be shown with reasonable definiteness and certainty and, if the proofs furnished failed to satisfy it of this fact, it may, by acting seasonably and in good faith, require further evidence, but the insurer, under the guise of demanding further proof, cannot arbitrarily object to the sufficiency of the claim. Some proof of death, due to accidental causes, was all that was required and if it also disclosed facts of which the insurer could avail itself as a defense to an action on a policy, this would not derogate from its sufficiency to establish the claim. Such disclosure might suggest to the insurer the propriety of refusing payment and withstanding suit but it would be no bar to the action, otherwise no suit could be brought until the parties had gone through an extra-judicial investigation resulting favorably to the insured. Charter Oak Life Insurance Company v. Rodel, 95 U.S. 232, 238, 24 L.Ed. 433; Forman v. New York Life Ins. Co., 267 Mich. 426, 255 N.W. 222. The proofs here in question, timely filed, showed the fall of the insured from the steps and his ensuing death. Some factual matters which the insurer required of the appellee were not furnished, but she stated to it the best evidence of the facts within her possession. Appellee was not bound to comply with appellant's requests with technical strictness, either as to the time or manner of insured's death. The proofs furnished by her tended to establish her claim under the policy. She made out a prima facie case showing that accidental death had occurred, which was sufficient compliance with the contract. Appellant's contention is without merit. Judgment affirmed.

HICKS, Circuit Judge (dissenting).

I think the evidence completely refutes the inference that Stinson's death resulted from accidental bodily injury, directly and independently of all other causes.